# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 5, 2011

No. 10-20445

Lyle W. Cayce
Clerk

CITIGROUP INC, as successor in interest to Associates First Capital
Corporation,

Plaintiff - Appellant-Cross-Appellee

v.

FEDERAL INSURANCE COMPANY; TWIN CITY FIRE INSURANCE
COMPANY; CHUBB ATLANTIC INDEMNITY, LTD; STEADFAST
INSURANCE COMPANY; SR INTERNATIONAL BUSINESS INSURANCE
COMPANY, LTD.,

Defendants - Appellees

ST. PAUL MERCURY INSURANCE COMPANY;

Defendant-Appellee-Cross-Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before SMITH and STEWART, Circuit Judges.[*]

CARL E. STEWART, Circuit Judge:

Associates First Capital Corporation (Associates) purchased integrated
risk policies from Certain Underwriters of Lloyd's of London (Lloyd's), the

---

[*] This case is being decided by quorum due to the death of Judge William L. Garwood
on July 14, 2011.  28 U.S.C. § 46(d).

No. 10-20445

primary insurer, and nine excess insurers. Pursuant to the integrated risk policies, Citigroup, Inc. (Citigroup), as successor-in-interest to Associates, timely notified the insurers of two actions filed within the policy period and made claims for coverage. Initially, all of the insurers denied coverage, but later, Lloyd's settled with Citigroup. The excess insurers continued to deny coverage, and Citigroup filed suit. After the parties filed motions for summary judgment, the district court dismissed Citigroup's claims for coverage. We AFFIRM and DISMISS as moot the cross-appeal of excess insurer St. Paul Mercury Insurance Company.

## I.

In July 1999, Associates, a nationwide consumer lender, purchased integrated risk policies from ten insurers that provided a total of $200 million in coverage. The policies were arranged in three layers. Associates' primary policy, issued by Lloyd's, provided $50 million in coverage. Once Associates incurred a covered loss exceeding the $50 million of primary coverage from Lloyd's, it could access $25 million in excess coverage from National Union Fire Insurance Company of Pittsburgh (National Union) and $25 million in excess coverage from Starr Excess Liability Insurance International, Ltd. (Starr), known as the "Secondary Layer." The third layer, or "Quota Share Layer," provided an additional $100 million of coverage, and was shared among seven additional insurers as follows: Ace Bermuda Insurance, Ltd. (Ace), $25 million; Federal Insurance Company (Federal), $17 million; Chubb Atlantic Indemnity (Chubb), $17 million; Twin City Insurance Company (Twin City), $17 million; St. Paul Mercury Insurance Company (St. Paul), $10 million; Steadfast Insurance Company (Steadfast), $9 million; SR International Business Insurance Company (SR), $5 million.

Citigroup, which acquired Associates on November 30, 2000, sought coverage from its insurers relating to two actions: (1) a statewide class action,

No. 10-20445

filed against Associates in California Superior Court for San Francisco County on June 25, 2001, entitled *Morales, et al. v. Associates First Capital Corp., et al.*, that alleged violations of the California Unfair Business Practices Act, fraud and deceit, negligent misrepresentation, breach of implied covenants of good faith and fair dealing, and unjust enrichment, and (2) a Federal Trade Commission (FTC) action, filed against Citigroup on March 6, 2001, that alleged that Associates violated the truth in lending statutes by misrepresenting that refinancing its customers' debts into a single loan secured by their homes would be beneficial. The insurers were timely notified of the *Morales* and FTC actions. Later, Citigroup entered into a settlement in these actions for $240 million plus $23 million in class counsel's fees and costs, without obtaining the consent of the carriers.

Each of the insurers initially denied coverage. However, Citigroup eventually entered into a settlement agreement with Lloyd's, pursuant to which Lloyd's paid Citigroup $15 million of its $50 million limits of liability in exchange for a release from coverage for the FTC and *Morales* claims. The Secondary Layer and Quota Share Layer insurers (collectively the excess insurers) continued to refuse coverage, and Citigroup filed suit in Texas state court.

Citigroup initially filed suit against each of the excess insurers. However, it settled its claims with National and Starr,[1] and its claims against Chubb Atlantic and ACE proceeded to arbitration and are stayed pending determination of this case. Accordingly, litigation proceeded with the five remaining excess insurers—Federal, Steadfast, St. Paul, SR, and Twin City. The state court action was removed to federal court, and after a brief period of

---

[1] Specifically, while the summary judgment motions, discussed *infra,* were under submission to the district court, Citigroup entered into settlement agreements with National Union and Starr Excess. Upon settlement, Citigroup's claims against National Union and Starr Excess were dismissed from this litigation in March 2009.

3

No. 10-20445

discovery, Citigroup and the excess insurers filed cross-motions for summary judgment.

The district court granted summary judgment in favor of the excess insurers. Specifically, the district court held that, per the excess insurers' policies, their liability to provide coverage did not attach, i.e. they were not liable to provide Citigroup with coverage, until Lloyd's paid its full $50 million limit of liability. The district court determined that, because Citigroup settled with Lloyd's for an amount less than $50 million, Citigroup was not entitled to coverage from the excess insurers as a matter of law. In the alternative, the district court addressed Twin City's, St. Paul's, and Federal's statute of limitations claims. The district court held that Texas's four-year statute of limitations barred Citigroup's claims for coverage against Twin City and that its claims against St. Paul were barred only to the extent Citigroup seeks coverage for losses stemming from the FTC action, but not those resulting from the *Morales* action. The district court also held that Texas's two-year statute of limitations barred Citigroup's claims for coverage against Federal.

Citigroup appealed, and St. Paul cross-appealed, challenging the district court's holding that the *Morales* action claim was not time-barred.

## II.

## A.

This is an appeal of the district court's summary judgment in favor of the excess insurers. We review a district court's grant of summary judgment *de novo*. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When a party seeks summary judgment pursuant to an affirmative defense, such as a statute of limitation, the movant must establish all of the elements of the defense. *Fontenot v. Upjohn Co.*, 780

4

No. 10-20445

F.2d 1190, 1194 (5th Cir. 1986).  If the movant does so, the burden shifts to the nonmovant to provide specific facts showing the existence of a genuine issue for trial.  FED. R. CIV. P. 56(c), (e).  In reviewing summary judgment, "[w]e construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (citation and internal quotation marks omitted).

Because our jurisdiction is based on diversity, we apply the substantive law of the forum state, here, Texas.  *See Erie R. v. Tompkins,* 304 U.S. 64 (1938).  To determine Texas law, we look to decisions of the state's highest court, or in the absence of a final decision by that court on the issue under consideration, we "must determine, in [our] best judgment, how the state's highest court would resolve the issue if presented with it."  *See Holt*, 627 F.3d at 191.  We also examine "the general rule on the issue, and the rules in other states that Texas might look to, as well as treatises and law journals."  *State Farm Fire and Cas. Co. v. Fullerton,* 118 F.3d 374, 378 (5th Cir. 1997).  We review a district court's application of state law *de novo.  Holt*, 627 F.3d at 191.

After carefully reviewing the policies at issue in this case, we conclude that the plain language of Federal's, Steadfast's, S.R.'s, and St. Paul's policies dictates that their coverage did not attach when Citigroup settled with Lloyd's. We also conclude that Citigroup's claim against Twin City is time barred.

**B.**

**1.**

Under Texas law, the general rules of contract interpretation govern a court's review of an insurance policy.  *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex. 2004).  Therefore, the primary goal is to give effect to the written expression of the parties' intent.  *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998).  If the policy language has only one reasonable interpretation, then it is not ambiguous, and courts must construe

5

No. 10-20445

it as a matter of law. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006).

Citigroup argues that, because the excess insurers' policies have more than one reasonable interpretation, the policy language is ambiguous, and we must construe the policies strictly in favor of the insured. Thus, Citigroup urges us to apply the rule established in *Zeig v. Massachusetts Bonding & Insurance Co.*, 23 F.2d 665 (2d Cir. 1928). *Zeig* stands for the proposition that, if an excess insurance policy ambiguously defines "exhaustion," settlement with an underlying insurer constitutes exhaustion of the underlying policy, for purposes of determining when the excess coverage attaches. *See* TOD I. ZUCKERMAN, SETTLEMENT WITH PRIMARY INSURER FOR LESS THAN POLICY LIMITS § 10:22 (2010). According to Citigroup, pursuant to the rule established in *Zeig*, its settlement with Lloyd's exhausted the primary insurance and the excess insurers were obligated to provide it with coverage.

Neither the Texas Supreme Court, nor this court sitting in diversity and applying Texas law, has adopted the *Zeig* rule. In the present case, we need not make an *Erie* guess to determine whether Texas courts would adopt the *Zeig* rule because Federal's, Steadfast's, S.R.'s, and St. Paul's policies are not ambiguous. Reviewing each policy separately to give effect to the written expression of the parties' intent, as required by Texas law, *see Utica Nat'l Ins. Co. of Tex.*, 141 S.W.3d at 202, we conclude that the plain language of the policies dictate that the primary insurer pays the full amount of its limits of liability before excess coverage is triggered. Because the degree of specificity varies among the four policies, we examine each separately.

**Federal.** The Federal policy states that coverage attaches only after "(a) all Underlying Insurance carriers have paid in cash the full amount of their respective liabilities, (b) the full amount of the Underlying Insurance policies have been collected by the plaintiffs, the Insureds or the Insureds' counsel, and

No. 10-20445

(c) all Underlying Insurance has been exhausted." The Federal policy leaves no ambiguity about how the underlying policy is exhausted. The policy clearly explains that exhaustion occurs through payment, in cash, and of the full amount of the underlying insurer's limit of liability.

Notably, part (b) of the policy provision requires that the "full amount" of the underlying insurer's limits of liability be exhausted before coverage attaches. If Federal's coverage attached with a settlement for less than the underlying insurer's limits of liability, as Citigroup contends, then the phrase "full amount" would be innocuous. Under Texas law, when interpreting the language of a policy, we are to read all parts of the policy together in order to give meaning to every sentence, clause, and word to avoid rendering part of the policy inoperative. *Balandran*, 972 S.W.2d at 741. Thus, we interpret the use of the phrase "full amount" in the policy to mean that settlement for less than the underlying insurer's limits of liability does not trigger Federal's coverage. *See Utica Nat'l Ins. Co. of Tex.*, 141 S.W.3d at 202; *see generally Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London,* 73 Cal. Rptr 3d 770, 778–79 (Cal. Ct. App. 2008) (interpreting "full amount of $20,000" to mean that the insured must pay the entire limit of liability to trigger its excess coverage (brackets omitted)). Accordingly, Citigroup's settlement with Lloyd's for less than Lloyd's full limit of liability did not trigger Federal's excess coverage.

**St. Paul.** The St. Paul policy states that coverage does not attach until the underlying policy's "total" limit of liability has been paid "in legal currency." The full provision reads: "The Insurer shall only be liable to make payment under this policy after the total amount of the Underlying Limit of Liability has been paid in legal currency by the insurers of the Underlying Insurance as covered loss thereunder." Like the Federal policy, the St. Paul policy clearly states how the underlying insurance is exhausted. The St. Paul policy not only requires payment, but also specifies that the "total" limit of liability, which is

7

defined in the policy as $50 million, be paid "in legal currency." Thus, the plain language of the St. Paul policy dictates that payment by an underlying insurer for less than $50 million will not trigger St. Paul's excess coverage. *See Utica Nat'l Ins. Co. of Tex.*, 141 S.W.3d at 202; *see generally Qualcomm, Inc.,* 73 Cal. Rptr 3d at 778–79. Accordingly, St. Paul's coverage did not attach when Citigroup settled with Lloyd's for less than Lloyd's "total" limit of liability.

**SR.** Coverage under the SR policy attaches "only after any Insurer subscribing to any Underlying Policy shall have agreed to pay or have been held liable to pay the full amount of its respective limits of liability as set forth in Item 5. of the Declarations." Item 5 of the Declarations states that the "limit of liability" for the underlying insurer is "$50,000,000." Therefore, the plain language of SR's policy requires that Lloyd's pay the "full amount" of its $50 million limit of liability before SR is liable to provide Citigroup with coverage. *See Utica Nat'l Ins. Co. of Tex.*, 141 S.W.3d at 202; *see generally Qualcomm, Inc.,* 73 Cal. Rptr 3d at 778–79. Because Lloyd's paid Citigroup less than the "full amount" of its $50 million limit of liability, we hold that SR's excess coverage did not attach.

**Steadfast.** The Steadfast policy provides that coverage attaches "[i]n the event of the exhaustion of all of the limit(s) of liability of such 'Underlying Insurance' solely as a result of payment of loss thereunder." Citigroup argues that exhaustion occurs pursuant to the Steadfast policy simply upon the payment of any loss. We disagree. To begin, similar to the other policies, the Steadfast policy requires that "all" of the underlying insurer's limits of liability be exhausted before coverage attaches. Thus, settlement for less than the underlying insurer's limits of liability does not exhaust the underlying policy. *See Utica Nat'l Ins. Co. of Tex.*, 141 S.W.3d at 202; *see generally Qualcomm, Inc.,* 73 Cal. Rptr 3d at 778–79. Furthermore, the use of the phrase "payment of loss" establishes that the underlying insurer must make *actual* payment to the

No. 10-20445

insured in order to exhaust the underlying policy. Although not binding on this court, the district court's reasoning in *Comerica v. Zurich American Insurance Co.*, 498 F. Supp. 2d 1019 (E.D. Mich. 2007), is persuasive and supports our interpretation.

In *Comerica*, the district court interpreted the phrase "payment of losses" to mean that *actual* payment of losses by the underlying insurer was necessary to trigger the excess coverage. *Id.* at 1032. The district court noted that "settlements that extinguish liability up to the primary insurer's limits, and agreements to give the excess insurer 'credit' against a judgment or settlement up to the primary insurer's liability limit are not the same as *actual* payment." *Id.* (emphasis added). Thus, the district court concluded in *Comerica* that, when a policy requires "payment" to trigger coverage, actual payment must be made, and settlement does not meet this requirement. *Id.*

The plain language of the Steadfast policy dictates that its coverage does not attach until the underlying insurer makes a payment equal to "all" the underlying insurer's limits of liability, which is defined in the policy as $50 million. Therefore, Citigroup's settlement with Lloyd's for less than the limit of liability did not trigger Steadfast's excess coverage.

In sum, the plain language of Federal's, Steadfast's, S.R.'s, and St. Paul's policies requires that Lloyd's pay Citigroup the total limits of Lloyd's liability before excess coverage attaches. Thus, Citigroup's settlement with Lloyd's for $15 million of its $50 million limits of liability in exchange for a release from coverage for the FTC and *Morales* claims, did not satisfy the requirements necessary to trigger the excess insurers' coverage.

**2.**

We apply state statutes of limitations in diversity cases. *Hensgens v. Deere & Co.*, 869 F.2d 879, 880 n.3 (5th Cir. 1989). In Texas, the statute of limitations for the breach of an insurance contract action is four years from the day the

cause of action accrues. TEX. CIV. PRAC. & REM. CODE § 16.051; *see also Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). A claim for breach of an insurance contract accrues and limitations begin to run on the date coverage is denied. *See Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828–29 (Tex. 1990). The parties agree that section 16.051's four-year statute of limitations applies to Citigroup's coverage claim against Twin City. However, they dispute when Citigroup was denied coverage for purposes of the claim's accrual. Citigroup argues that its coverage claim against Twin City, regarding the FTC and *Morales* actions, did not accrue until Twin City sent a denial letter on October 29, 2002 (hereinafter the October 2002 letter). Conversely, Twin City argues that Citigroup's claim accrued, at the latest, when Twin City sent a letter denying coverage on April 30, 2002 letter (hereinafter the April 2002 letter). The Texas Supreme Court's decision in *Provident Life and Accident Insurance Co. v. Knott*, 128 S.W.3d 211 (Tex. 2003), provides guidance.

In *Knott*, the Texas Supreme Court explained that in order for a letter to constitute a denial, the letter need not use the word "denial," but only state that there is not coverage for the claim and give reasons why coverage is being denied (hereinafter the *Knott* rule). *Id.* at 221–22. Accordingly, courts applying the *Knott* rule have focused on whether letters, addressing coverage, contain language communicating that the insurer is denying coverage and not "magic words . . . used to deny a claim." *Id.* at 222; *see also Lozada v. Farrall & Blackwell Agency, Inc.*, 323 S.W.3d 278, 291 (Tex. App.—El Paso 2010, no pet.) (claim accrued when the insured received a letter explaining that "no policy was in force and no benefits are payable"); *Pace v. Travelers Lloyds of Tex. Ins. Co.*, 162 S.W.3d 632, 634 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (A letter stating that "'we have determined that the damage to your property is not afforded coverage under the insurance policy,' provided a reason for the decision,

then reiterated that 'we will be unable to make payment[,]' unequivocally communicated a decision to deny coverage.").

The April 2002 letter contains statements clearly communicating Twin City's denial of coverage and the reasons for the denial. Notably, the letter states:

> Because the Claim was made nearly three years prior to the July 15, 2000 inception date of the Twin City Policy, we are constrained to advise that the Insuring Agreements . . . of the Primary Policy have not been triggered. Consequently, Twin City regrets that it cannot extend coverage under its policy for this matter.

The letter further states:

> In light of the foregoing, Twin City is constrained to advise that no coverage is afforded this matter under the Twin City Policy. The foregoing statements of Twin City should not be deemed as the only bases upon which Twin City's coverage position rests, but rather that are based upon the allegations asserted in the complaints referenced above, and presently known facts.

The language used in the April 2002 letter—"Twin City cannot extend coverage" and "no coverage is afforded"—unequivocally communicates that Twin City would not provide coverage to Citigroup. Therefore, Citigroup's claims accrued at the latest in April 2002. As the claims are governed by a four-year statute of limitations, Citigroup's suit filed in October 2006 against Twin City was untimely.

## III.

For the foregoing reasons, we AFFIRM the district court's judgment. Because we affirm the district court's judgment, we DISMISS St. Paul's cross-appeal as moot.