

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| QUELLOS GROUP LLC, | ) | No. 68478-7-I |
| | ) | |
| Appellant/Cross Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY; | ) | |
| INDIAN HARBOR INSURANCE | ) | |
| COMPANY, | ) | PUBLISHED OPINION |
| | ) | |
| Respondents/Cross Appellants, | ) | |
| | ) | |
| STEADFAST INSURANCE COMPANY; | ) | |
| AND NUTMEG INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | FILED: November 12, 2013 |

SCHINDLER, J. — An excess insurance policy provides coverage only after underlying insurance coverage is exhausted. Quellos Group LLC appeals summary judgment dismissal of the lawsuit against excess insurance carriers Federal Insurance Company and Indian Harbor Insurance Company for failure to exhaust the underlying insurance coverage. The Federal policy states coverage "shall attach only after the insurers of the Underlying Insurance shall have paid in legal currency the full amount of the Underlying Limit." The Indian Harbor policy states coverage "will attach only after all of the Underlying Insurance has been exhausted by the actual payment of loss by the applicable insurers thereunder." Because the plain and unambiguous language of the

excess insurance policies require exhaustion of the underlying liability limits by actual payment by the insurer before excess coverage is triggered, and there is no dispute that the underlying insurers did not pay policy limits, we affirm.

FACTS

Quellos Group LLC was a Seattle-based investment management company. Beginning in 1999, former Chief Executive Officer (CEO) Jeffrey Greenstein and Quellos Director and attorney Charles Wilk, together with other Quellos employees, developed a new tax shelter strategy, the "Personally Optimized INvestment Transaction" (POINT). The POINT tax shelter gave wealthy clients the opportunity to offset large capital gains by acquiring securities with built-in losses. Quellos used two offshore shell corporations and a "paper portfolio of over $9 billion in U.S. high tech stocks" to create "fake" capital losses for the POINT transactions. The fee Quellos charged clients was based on the amount of the POINT transaction tax loss.

> Using circular transactions and offsetting payments that cancelled each other out, these offshore corporations created a paper portfolio of over $9 billion in U.S. high tech stocks that appeared to suffer price drops and generated the fake capital losses used in the POINT transactions. The fees charged by Quellos depended upon the amount of tax loss generated in each transaction for the taxpayer who bought the shelter; the more money the taxpayer "lost" from the transaction, the more Quellos charged for the scheme.

Quellos recognized the importance of obtaining legal opinions from well regarded law firms on the tax consequences of the POINT tax shelter. Quellos provided false information and documentation to the law firms on the POINT tax shelter in order to obtain favorable legal opinions that supported the POINT strategy.

Between 2000 and 2002, six Quellos clients agreed to use the POINT tax shelter. The first three POINT client transactions took place between April and September 2000.

2

In September 2000, Quellos purchased layers of insurance coverage for investment management claims against its directors and officers.

Quellos purchased a claims-made insurance policy from American International Specialty Lines Insurance Company (AISLIC), an "Investment Management Insurance Policy," for the period of September 21, 2000 through September 21, 2002, with a liability limit of $20 million. Quellos purchased excess insurance coverage for the period of September 21, 2000 to September 21, 2004 from AISLIC and other carriers.

The next three POINT client transactions occurred in late 2000 and 2001. In total, the POINT transactions protected approximately $2 billion in capital gains from federal taxes and generated approximately $65 million in fees to Quellos.

In 2004, AISLIC issued a claims-made Investment Management Insurance Policy to Quellos with a $10 million liability limit for the period of September 21, 2004 to September 21, 2005. The policy was subject to a $2.5 million self-insured retention. Under the terms of the policy, there is no duty to defend. The AISLIC policy provides coverage to the past, present, or future officers, directors, and employees of Quellos for damages, including defense costs resulting from claims first made during the "Policy Period . . . for any Wrongful Act" in rendering services as an investment adviser and for other professional services.[1]

---

[1] The AISLIC policy provides, in pertinent part:

With respect to any such Wrongful Act for which insurance is afforded by this policy under Insuring Agreement I Coverages A, B, C or D above, the Company shall, as part of and subject to the limit of liability set forth in Item 3 of the Declarations, pay the Insured's Defense Costs as they are incurred.

"Defense Costs" are defined as

reasonable and necessary fees, costs and expenses . . . incurred by the Company or by the Insured with the written consent of the Company, and resulting solely from the investigation, adjustment, defense and appeal of any claim against the Insured.

Quellos obtained excess coverage from Federal Insurance Company and second-tier excess coverage from Indian Harbor Insurance Company for the policy period of September 21, 2004 to September 21, 2005. The first-tier Federal policy provided a $10 million liability limit after exhaustion of the AISLIC policy limits. The second-tier Indian Harbor policy provided excess coverage of $20 million after exhaustion of AISLIC and Federal coverage policy limits. The Federal and Indian Harbor policies are subject to and incorporate the terms of the AISLIC primary policy, and do not provide coverage for claims excluded from coverage under the AISLIC policy.

The AISLIC policy provides, in pertinent part:

1.    **INSURING AGREEMENTS**

. . . .

**COVERAGE A: INVESTMENT ADVISER PROFESSIONAL LIABILITY — AND CORPORATE REIMBURSEMENT**

This policy shall, subject to the limit of liability set forth in Item 3 of the Declarations, pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported in writing to the Company during the Policy Period or the Extended Reporting Period (if applicable) for any Wrongful Act of the Insured or of any person for whose Wrongful Act the Insured is legally responsible, but only if such Wrongful Act occurs prior to the end of the Policy Period and solely in rendering or failing to render Investment Advisory Services for others for compensation in the course of the Entity Insured's business as an Investment Adviser; and with respect to the Entity Insured including amounts which the Entity Insured is permitted or required to pay as indemnification for such liability of the Individual Insured.

. . . .

**COVERAGE C: DIRECTORS AND OFFICERS LIABILITY AND CORPORATE REIMBURSEMENT**

This policy shall, subject to the limit of liability set forth in Item 3 of the Declarations, pay on behalf of the Executive Insured all sums which the Executive Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Executive Insured and reported in writing to the Company during the Policy Period or the Extended Reporting Period (if applicable) for any Wrongful Act of the Executive Insured or of any

4

other person for whose Wrongful Act the Executive Insured is legally responsible, but not Wrongful Acts to which Coverage A or Coverage D applies or would apply if it had been effected under this policy, and only if such Wrongful Act occurs prior to the end of the Policy Period; and with respect to the Entity Insured including amounts which the Entity Insured is permitted or required to pay as indemnification for such liability of the Executive Insured. This Coverage C shall not apply to Executive Insureds of the Funds for any Wrongful Act in their capacity as such.[2]

The AISLIC policy defines "Wrongful Acts" as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act wrongfully done or attempted by the Insured." The AISLIC policy expressly excludes from coverage "any claim arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act by any Insured, or any knowing or willful violation of any statute by any Insured." The policy also excludes "any actual or alleged Wrongful Act committed with knowledge that is was a Wrongful Act" and "any actual or alleged Wrongful Act occurring prior to the Continuity Date specified in Item 6 of the Declarations, if on or before such Continuity Date any Insured knew of such Wrongful Act or could have reasonably foreseen that such Wrongful Act could lead to a claim."[3]

The Internal Revenue Service (IRS) audited the tax returns of the six Quellos clients who used the POINT tax shelter. In February 2005, the IRS subpoenaed POINT transaction documents from Quellos. The IRS denied the tax benefits claimed by the Quellos clients.

In June 2005, one of the POINT tax shelter clients notified Quellos of the intent to file a lawsuit. In March 2006, Quellos entered into a settlement with the client, and the client agreed to release all claims against Quellos and its directors and officers. In

---

[2] (Emphasis in original.)

[3] The "Continuity Date" is September 20, 2000.

5

March 2006, another POINT client threatened legal action. In November 2007, Quellos entered into a settlement agreement, and the client released all claims against Quellos and its directors and officers.

In September 2005, the United States Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs (Senate Subcommittee) initiated an investigation and subpoenaed information from Quellos about the POINT tax shelter strategy. Former Quellos CEO Jeffrey Greenstein testified before the Senate Subcommittee.

On August 1, 2006, the Senate Subcommittee issued a report on Tax Haven Abuses: The Enablers, the Tools and Secrecy, 109th Cong. 1. The report describes the Quellos POINT tax shelter as a complex securities transaction "aimed at sheltering over $2 billion in capital gains from U.S. taxes, relying in part on offshore secrecy to shield its workings from U.S. law enforcement." Tax Haven Abuses, at 3.

In July 2007 and June 2008, the United States Attorney's Office for the Western District of Washington issued subpoenas to Quellos to obtain information and documents related to the POINT transactions, and convened a grand jury.

In 2008, the State of California Franchise Tax Board (Board) audited the tax return of a Quellos client who used the POINT tax shelter. The Board concluded the POINT tax shelter was fraudulent and assessed approximately $1 million in penalties against Quellos.

In December 2009, the United States Attorney filed an indictment charging Greenstein and Wilk with conspiracy to defraud the IRS, tax evasion, counseling false tax returns, wire fraud, and conspiracy to launder monetary instruments. In the 42-page

indictment, the United States Attorney alleges that from 1999 to 2001, Greenstein, Wilk,

and others designed, marketed, and implemented POINT as a "pre-ordained series of

sham transactions . . . for the sole purpose of providing a means for wealthy individuals

to reduce and/or defer the payment of taxes on capital gains income."

On September 10, 2010, Greenstein and Wilk pleaded guilty to conspiracy to

defraud the IRS of $240 million in taxes. Greenstein and Wilk admitted that they

conspired with others to defraud the IRS by designing and promoting the fraudulent

POINT tax shelter. Greenstein and Wilk admitted, in pertinent part:

> Beginning in 1999 and continuing through 2005, Jeffrey Greenstein, together with Charles Wilk, and others conspired and agreed to defraud the Internal Revenue Service by designing, promoting, and implementing a fraudulent tax shelter, which they referred to by the acronym, POINT, and by directly and indirectly deceiving and lying to the IRS during examinations of returns that taxpayers filed in reliance upon POINT. To accomplish the objective of this conspiracy, Jeffrey Greenstein and Charles Wilk worked with individuals at European American Investment Group (EURAM) to create fictitious losses through the purported purchase and sale of "synthetic" stock with a paper value exceeding $9.6 Billion between two Special Purpose Vehicles (SPV's), Isle of Man businesses, Jackstones, Ltd., and Barnville, Ltd, which had no assets. In truth there was no actual stock; no purchase and sale of actual stock; no payment for actual stock, and no basis in stock. These fictitious losses were used in POINT to offset approximately equal dollar amounts of real capital gains, thereby deferring substantial capital gains taxes.
>
> As part of the conspiracy and in furtherance of it, Jeffrey Greenstein and Charles Wilk told wealthy individuals and their advisors with substantial capital gains that they could defer taxes on such capital gains by participating in POINT. The defendants then provided and caused to be provided to these willing taxpayers, information and documentation for POINT that they knew were false. They also provided these taxpayers with legal opinions, based upon the same false information and documentation, that attested to the probable legitimacy of POINT. Defendants knew these opinions relied on false information and documentation.
>
> The taxpayers, in reliance upon the losses generated by POINT, filed individual and partnership returns in which they claimed huge losses as a means of offsetting real capital gains, thereby deferring taxes of approximately $240 Million. When these returns came under audit, the

7

defendants gave the taxpayers and their advisors the same false information and documentation and the defendants knew that the taxpayers and their advisors would use the false information and documentation in responding to the IRS. The false information and documentation purportedly explained the genesis and business purpose of the POINT strategy.

Quellos sought reimbursement from AISLIC, Federal, and Indian Harbor for the policy period of September 21, 2004 to September 21, 2005 for the POINT transaction settlements and costs related to the government investigations.[4] In addition to seeking approximately $35 million for the settlements with the individual investors, Quellos sought approximately $45 million in defense costs and other costs incurred in connection with the investigation of the IRS, the Senate Subcommittee, and the United States Attorney.

AISLIC determined that Quellos was entitled to coverage under the 2004-2005 policy for $4,982,974 of the $10 million policy limit. Federal and Indian Harbor refused to pay under a reservation of rights and on the grounds that the underlying insurance limits had not been exhausted.

In December 2010, Quellos filed a breach of contract and declaratory judgment action against AISLIC and excess insurance carriers Federal, Indian Harbor, Steadfast Insurance Company, and Nutmeg Insurance Company. Quellos alleged the insurance carriers breached the terms of the insurance policies issued from 2000 through 2006 by denying coverage for defense and other costs related to the investigations and POINT transactions.[5]

---

[4] Quellos did not seek coverage under the 2000-2004 policies for its claims related to the POINT transactions.

[5] Quellos purchased additional excess coverage from September 21, 2000 to September 21, 2004 from AISLIC, Steadfast, and Nutmeg that is not relevant to this appeal.

AISLIC, Federal, and Indian Harbor denied Quellos was entitled to coverage for defense and other costs under the terms of the policies. In addition to asserting the claims were barred by the AISLIC policy exclusions, including the exclusion for "any actual or alleged Wrongful Act committed with knowledge that it was a Wrongful Act," the excess carriers asserted coverage was not triggered until after Quellos exhausted underlying coverage and policy limits.

In June 2011, Quellos entered into a global settlement agreement with AISLIC. In the "Confidential Settlement and Release Agreement" dated June 27, 2011, AISLIC agreed to pay $5 million under the excess policy that AISLIC issued in 2000 for contingent deferred swap transactions, and $10 million under the 2006 AISLIC primary policy in connection with a Texas lawsuit. AISLIC did not agree to pay any additional amounts under the 2004-2005 policy. In an effort to trigger the excess insurance coverage for the 2004-2005 policy period, Quellos agreed to pay the gap between the $10 million liability limit and the approximately $5 million AISLIC had previously agreed to pay under the 2004-2005 policy.

The excess carriers filed a motion for summary judgment dismissal of the breach of contract and coverage claims on the grounds that the Wrongful Act and other exclusions in the AISLIC policy barred coverage for defense and other costs related to the fraudulent POINT tax shelter. Federal and Indian Harbor also filed a separate motion for summary judgment dismissal on the grounds that under the express terms of the policies, the failure to exhaust primary coverage was an absolute bar to excess insurance coverage.

Quellos filed a cross motion for "Partial Summary Judgment Regarding Exhaustion of Underlying Limits of Insurance." Quellos conceded the settlement agreement with AISLIC released AISLIC from any further liability under the 2004-2005 policy, that AISLIC paid only approximately one-half of the policy limits for the 2004-2005 policy period, and the settlement agreement did not allocate any additional payments for the 2004-2005 policy period. Quellos argued that a literal interpretation of the exhaustion requirement violated the policy of promoting settlements. In the alternative, Quellos argued that because the exhaustion requirements function as "a condition to coverage," the excess carriers waived the right to invoke the condition and could not establish breach of the exhaustion requirement was either material or prejudicial.

The court granted in part and denied in part the motion for summary judgment on the exclusions. The court ruled, in pertinent part: "Each of the Exclusions apply to Quellos's claims, but there are genuine issues of material fact as to which amounts sought by Quellos in this action are covered, if any, and which are not."

The court granted the excess carriers' motion for summary judgment for failure to exhaust the underlying coverage and policy limits. The court ruled that under the plain and unambiguous language of the policies, Quellos did not exhaust the underlying limits of liability.

> And in this particular case the court finds that neither the Federal Insurance Company policy nor the Indian Harbor Insurance Company policy language are ambiguous, and if they're not ambiguous, the court will give effect to the policy language that the parties entered into and therefore the cases, virtually all of the cases that the plaintiff cites to the court on this particular issue, are not applicable and are fully distinguishable.
> . . . .

10

[T]he Washington cases do not actually construe condition as -- the term condition as broadly as the policy holder here would ask us to do and simply there is a substantial difference between a grant of coverage and conditions to that coverage itself.

. . . .

And in this particular case, the attachment point or underlying limit or however you want to characterize it, that particular issue is the essential characteristic of an excess insurance. I mean, that is, essentially, what distinguishes it from anything else. It follows form, essentially, to the primary insurance and the only difference is the attachment point. I mean, that is the one distinguishing factor.

. . . It is that factor which basically is the defining aspect of excess insurance policy itself. So it is not a mere condition to coverage that is susceptible to the prejudice analysis, but rather, it is the defining characteristic of an excess insurance policy.

The court entered a final judgment under CR 54(b). The "Corrected CR 54(B) Stipulation Re Final Judgment" states, in pertinent part:

Since Quellos' claims against Federal and Indian Harbor arise from the POINT Claims and are unrelated to Quellos' claims against Nutmeg, which arise out of . . . separate and distinct . . . Transactions, there is no just reason for delay of entry of a final and appealable judgment as to the summary judgment orders dismissing Quellos' claims against Federal and Indian Harbor. There is no reason to delay the process towards resolving the disputes between Quellos and Federal/Indian Harbor.

ANALYSIS

Quellos contends the court erred by dismissing the lawsuit against excess carriers Federal and Indian Harbor for failure to exhaust the underlying policy limits.[6] In an effort to avoid the exhaustion requirement and shift the burden to the excess carriers, Quellos argues exhaustion is a condition and the excess carriers did not establish either material breach or prejudice. The excess carriers assert exhaustion of

---

[6] Federal and Indian Harbor filed a cross appeal challenging denial of the motion for summary judgment on the policy exclusions. A denial of summary judgment is not an appealable order. RAP 2.2(a)(1); In re Estate of Jones, 170 Wn. App 594, 605, 287 P.3d 610 (2012) ("denial of a summary judgment motion is not a final order that can be appealed"). While the corrected CR 54(b) final judgment lists the order granting in part and denying in part the motion for summary judgment regarding policy exclusions, the order expressly finds that the final and appealable judgment relates only to dismissing the claims against Federal and Indian Harbor.

11

the primary policy limits is the critical and defining feature of excess policy coverage and under the plain and unambiguous language of the excess insurance policies, the court did not err in granting summary judgment dismissal. We agree with the excess carriers.

We review summary judgment de novo. Smith v. Safeco Ins. Co., 150 Wn.2d 478, 483, 78 P.3d 1274 (2003). Interpretation of an insurance contract is a question of law that we also review de novo. Overton v. Consol. Ins. Co., 145 Wn.2d 417, 424, 38 P.3d 322 (2002); McDonald v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 730-31, 837 P.2d 1000 (1992). We construe an insurance policy in the same manner as a contract. Quadrant Corp. v. Am. States Ins. Co., 154 Wn.2d 165, 171, 110 P.3d 733 (2005). The policy should be read as a whole and given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance. Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co., 134 Wn.2d 413, 427-28, 951 P.2d 250 (1998). The insured has the burden of establishing coverage. McDonald, 119 Wn.2d at 731.

When interpreting an insurance contract, our primary goal is to determine the intent of the parties and view the contract as a whole; a phrase cannot be interpreted in isolation. Allstate Ins. Co. v. Peasley, 131 Wn.2d 420, 424, 932 P.2d 1244 (1997). "[A] court must construe the entire contract together so as to give force and effect to each clause." Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co., 124 Wn.2d 789, 797, 881 P.2d 1020 (1994). "[T]he expectations of the insured cannot override the plain language of the contract." Quadrant, 154 Wn.2d at 172. A provision is ambiguous only if on its face, it is fairly susceptible to more than one reasonable interpretation. Quadrant, 154 Wn.2d at 171. If the policy language is clear and unambiguous, we must

12

enforce it as written and not modify the insurance contract or create ambiguity where none exists. Quadrant, 154 Wn.2d at 171.

An excess insurance policy provides coverage "over and above that available through an underlying policy." Christal v. Farmers Ins. Co. of Wash., 133 Wn. App. 186, 195, 135 P.3d 479 (2006). The critical and distinctive feature of an excess insurance policy is that it provides coverage "only after the primary coverage is exhausted." Diaz v. Nat'l Car Rental Sys., Inc., 143 Wn.2d 57, 62, 17 P.3d 603 (2001).

Federal issued a first-tier excess insurance policy for the policy period of September 21, 2004 to September 21, 2005 with a liability limit of $10 million. The excess coverage is subject to the terms and conditions of the primary AISLIC policy, and attaches only after AISLIC pays "in legal currency the full amount of the Underlying Limit." The Federal excess policy states, in pertinent part:

> In consideration of the payment of the premium and subject to the Declarations, limitations, conditions, provisions and other terms of this policy, the Company agrees as follows:

> **Insuring Clause**    1.    The Company shall provide the Insureds with insurance during the Policy Period excess of the Underlying Limit. Coverage hereunder shall attach only after the insurers of the Underlying Insurance shall have paid in legal currency the full amount of the Underlying Limit for such Policy Period. Coverage hereunder shall then apply in conformance with the terms and conditions of the Primary Policy as amended by any more restrictive terms and conditions of any other policy designated in Item 4(B) of the Declarations, except as otherwise provided herein.[7]

---

[7] (Second emphasis added.)

13

The Federal policy defines the "Underlying Limit" to mean "the amount equal to the aggregate of all limits of liability as set forth in Item 4 of the Declarations for all Underlying Insurance, . . . plus the applicable uninsured retention, if any, under the Primary Policy." The Federal policy declarations identify the "Underlying Insurance" as the "Primary Policy" issued by AISLIC.

Other sections of the Federal policy reiterate the requirement to exhaust underlying limits through payment by the underlying insurer. The "Maintenance of Underlying Insurance" section states:

> All Underlying Insurance shall be maintained in full effect during the Policy Period and shall afford the same coverage provided by all Underlying Insurance in effect upon inception of this Policy Period, except for any depletion or exhaustion of the Underlying Limit solely by reason of payment of losses thereunder.[8]

The "Depletion of Underlying Limits" section of the Federal policy states:

> Only in the event of exhaustion of the Underlying Limit by reason of the Insurers of the Underlying Insurance, or the Insureds in the event of financial impairment or insolvency of an insurer of the Underlying Insurance, paying in legal currency loss which, except for the amount thereof, would have been covered hereunder, this policy shall continue in force as primary insurance, subject to its terms and conditions and any retention applicable to the Primary Policy, which retention shall be applied to any subsequent loss in the same manner as specified in the Primary Policy.
> The risk of uncollectability of any Underlying Insurance, whether because of financial impairment of insolvency of an underlying insurer or any other reason, is expressly retained by the Insureds and is not in any way insured or assumed by the Company.[9]

Indian Harbor issued a second-tier excess insurance policy for the policy period of September 21, 2004 to September 21, 2005 with a liability limit of $20 million. The Indian Harbor policy is subject to the terms and conditions of the AISLIC primary policy

---

[8] (Emphasis added.)

[9] (Emphasis added.)

and the terms and conditions of the Federal excess policy. The Indian Harbor policy does not provide coverage until all of the underlying insurance has been exhausted "by the actual payment of loss by the applicable insurers."

The "Insuring Agreement" of the Indian Harbor policy states, in pertinent part:

> The coverage hereunder will attach only after all of the Underlying Insurance has been exhausted by the actual payment of loss by the applicable insurers thereunder and in no event will the coverage under this Policy be broader than the coverage under any Underlying Insurance.[10]

The Indian Harbor policy defines "Underlying Insurance" as the AISLIC primary policy and the first-layer Federal excess policy.

The Indian Harbor policy reiterates the requirement of exhaustion of all underlying insurance by actual payment of loss by the insurer in the "Depletion of Underlying Limits of Liability" and "Maintenance of Underlying Insurance" provisions. The Depletion of Underlying Limits of Liability provision states:

(A)     This policy, subject to the terms, conditions, limitations and endorsements of this Policy and the Underlying Insurance, will continue to apply to loss as excess insurance remaining under such Underlying Insurance, in the event of the reduction or exhaustion of the limits of liability of the Underlying Insurance solely as the result of the actual payment of loss by the applicable insurer thereunder.

(B)     This Policy, subject to the terms, conditions, limitations and endorsements of this Policy and the Underlying Insurance, will continue for subsequent claims or loss as primary insurance in the event of the exhaustion of all of the limits of liability of such Underlying insurance solely as the result of the actual payment of loss by the applicable insurer thereunder.

(C)     Any risk of uncollectibility with respect to the Underlying Insurance will be expressly retained by the Insured and will not be assumed by the Insurer.

    This Policy, subject to all its terms, conditions and endorsements, will not drop down for any reason including, but not limited to uncollectibility (in whole or in part) whether because of financial impairment or insolvency of the Underlying Insurance or for any

---

[10] (Emphasis added.)

15

other reason <u>except for the actual payment of loss by the applicable Insurer thereunder.</u>[11]

The Maintenance of Underlying Insurance provision states, in pertinent part:

<u>The limit(s) of liability of the Underlying Insurance designated in ITEM 4 of the Declarations shall be maintained during the Policy Period in full effect except for any reduction or exhaustion of the aggregate limits of liability available under the Underlying Insurance solely by reason of actual payment of loss thereunder.</u>[12]

In interpreting the provisions of the excess insurance contracts as a whole, the plain and unambiguous language compels the conclusion that excess coverage was not triggered by the agreement of Quellos to pay the policy limits of approximately $5 million that AISLIC refused to pay. Under the Federal and Indian Harbor policies, the excess carriers agreed to provide coverage only after exhaustion by payment of the insurer of the underlying policy limits. The Federal policy requires payment by primary insurer AISLIC "in legal currency" for the full amount of the underlying insurance. The Indian Harbor policy states that coverage does not attach unless the underlying insurance coverage is exhausted by the "actual payment" of the claim by underlying insurers AISLIC and Federal.

Use of the language "only after" in the insuring clause in the policies does not mean that the requirement that the insurer must pay the full amount of the underlying policy limits before the excess insurer is obliged to provide coverage is a condition. The language "only after" reflects the distinguishing characteristic and function of an excess insurance policy.

The terms of an insurance agreement establish whether the function of the policy is to attach coverage immediately upon the happening of an accident (in which case the policy is primary), or whether the function of

_____

[11] (Emphasis added.)
[12] (Emphasis added.)

the policy is to provide coverage <u>only after</u> the primary coverage is exhausted (in which case it is excess).

<u>Diaz</u>, 143 Wn.2d at 62.[13]

We also reject the argument that the exhaustion requirement should be treated in the same manner as a cooperation or notice requirement. In contrast to a cooperation or no-settlement clause, the requirement that the underlying insurer must first pay the full amount of the underlying policy limits in order to trigger excess insurance coverage does not "designate the manner in which claims covered by the policy are to be handled once a claim has been made." <u>Klickitat County</u>, 124 Wn.2d at 803; <u>Or. Auto. Ins. Co. v. Salzberg</u>, 85 Wn.2d 372, 377, 535 P.2d 816 (1975).[14] Rather, the policies unambiguously state how the underlying insurance is exhausted. <u>See also Goodyear Tire & Rubber Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 694 F.3d 781, 783 (6th Cir. 2012) ("[T]his case does not concern a mere notice or cooperation requirement . . . . Rather, the provision at issue here is where the rubber hits the road: the agreement's Insuring Clause, under whose terms [the insurer] undisputedly did not agree to provide the coverage that [the insured] now seeks.").

In the alternative, Quellos asserts that a literal interpretation of the standardized language in the excess policies to preclude Quellos from paying the approximately $5 million gap contravenes the public policy in favor of settlements, and produces an absurd result.[15]

---

[13] (Emphasis added.)

[14] Quellos cites and relies on a number of unpublished cases that are neither precedential nor persuasive.

[15] Quellos also claims that the excess carriers waived the right to demand compliance with the exhaustion requirement. But the record shows that AISLIC consistently denied liability for the policy limits under the terms of the 2004-2005 policy. The excess carriers also consistently identified the exhaustion requirement.

The record does not support the assertion that the exhaustion provision in the Federal and Indian Harbor policies is standardized language. Unlike the language in the Federal and Indian Harbor policies, the excess insurance policy issued by AISLIC for 2000 to 2002 allowed Quellos to pay underlying policy limits in order to trigger excess insurance coverage. The AISLIC excess policy provided, in pertinent part:

> It is expressly agreed that liability for any covered Loss with respect to Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy shall attach to the Insurer only after the Underlying Insurers and/or the Insureds or the Company shall have paid the full amount of the Total Underlying Limits, and the Company or the Insureds shall have paid the full amount of the applicable Retention amount under any Underlying Policy. In the event, and only in the event, of exhaustion of the Total Underlying Limits by reason of the Underlying Insurers and/or the Insured or the Company paying Loss covered thereunder, this policy shall: (i) in the event of reduction, pay excess of the reduced Total Underlying Limits, and (ii) in the event of exhaustion, continue in force as primary insurance.[16]

The record also shows that an amendment was available from Indian Harbor that allowed the insured as well as the underlying insurer to pay the full amount of the underlying policy limits to trigger excess coverage.[17]

Neither the Washington Supreme Court's decision in Seafirst Center Limited Partnership v. Erickson, 127 Wn.2d 355, 898 P.2d 299 (1995), nor Zeig v. Massachusetts Bonding & Insurance Co., 23 F.2d 665 (2d Cir. 1928), support the

---

[16] (Emphasis added.)

[17] In consideration of the premium charged, Section III Depletion of Underlying Limits of Liability (C) of the Policy is amended to read in its entirety as follows:

(C)    Any risk of uncollectibility with respect to the Underlying Insurance will be expressly retained by the Insured and will not be assumed by the Insurer.

This Policy, subject to its terms, conditions and endorsements, will not drop down for any reason including, but not limited to uncollectibility (in whole or in part) whether because of financial impairment or insolvency of the Underlying Insurance or for any other reason except for the actual payment of loss by the applicable Insurer thereunder or the Insured.

(Emphasis added) (internal quotation marks omitted).

argument that public policy should override the unambiguous exhaustion language in the Federal and Indian Harbor policies.

In Seafirst, the court did not rewrite the plain and unambiguous terms of the contract. The court abrogated the common law rule of discharge for settlements that involve joint contractual obligations. Seafirst, 127 Wn.2d at 364. In Zeig and the other cases Quellos cites that follow Zeig, there was either an ambiguity in the definition of "exhaustion" or a lack of specificity in the policy language as to how to exhaust primary insurance. See Zeig, 23 F.2d at 666; see also Stargatt v. Fid. & Cas. Co. of N.Y., 67 F.R.D. 689 (D. Del. 1975) (policy did not define "exhaustion"); Reliance Ins. Co. v. Transamerica Ins. Co., 826 So. 2d 998 (Fla. Dist. Ct. App. 2001) ("exhaustion" not defined).

In Zeig, the excess insurance policy required exhaustion of the underlying policy, but was silent about whether the full amount of the underlying policy needed to be collected or actually paid out before the excess policy was triggered. The Second Circuit held the underlying policy was exhausted by a settlement agreement and public policy favoring settlement supported that conclusion. Zeig, 23 F.2d at 666.

> The defendant argues that it was necessary for the plaintiff actually to collect the full amount of the policies for $15,000, in order to "exhaust" that insurance. Such a construction of the policy sued on seems unnecessarily stringent. It is doubtless true that the parties could impose such a condition precedent to liability upon the policy, if they chose to do so. But the defendant had no rational interest in whether the insured collected the full amount of the primary policies, so long as it was only called upon to pay such portion of the loss as was in excess of the limits of those policies. To require an absolute collection of the primary insurance to its full limit would in many, if not most, cases involve delay, promote litigation, and prevent an adjustment of disputes which is both convenient and commendable. A result harmful to the insured, and of no rational

19

advantage to the insurer, ought only to be reached when the terms of the contract demand it.

Zeig, 23 F.2d at 666.

Here, unlike in Zeig, the plain and unambiguous language of the excess insurance policies unambiguously states how the underlying insurance is exhausted. The policies require the underlying insurer to pay the full amount of its limits of liability before excess coverage is triggered. AISLIC paid only approximately one-half of the $10 million policy limits and continued to dispute whether Quellos was entitled to coverage under the 2004-2005 policy for defense and other costs related to the investigations into the fraudulent POINT tax shelter scheme. See also Citigroup, Inc. v. Fed. Ins. Co., 649 F.3d 367, 372 (5th Cir. 2011) ("the plain language of the [excess insurance] policies dictate that the primary insurer pays the full amount of its limits of liability before excess coverage is triggered"); Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London, 73 Cal. Rptr. 3d 770, 785 (Cal. Ct. App. 4 2008) (because the exhaustion language in the excess policy unambiguously precluded coverage, the court rejected argument that the public policy promoting settlement contravened the policy language).

Because the exhaustion language in the Federal and Indian Harbor excess insurance policies is clear and unambiguous, we must enforce it as written, and affirm summary judgment dismissal of the lawsuit against Federal and Indian Harbor. However, because the order to seal "Exhibit G," "Plaintiff Quellos Group LLC's Responses and Objections to Defendant Indian Harbor Insurance Company's First Set of Interrogatories to Plaintiff," does not comply with GR 15 or Seattle Times Co. v.

Ishikawa, 97 Wn.2d 30, 640 P.2d 716 (1982), we remand to consider whether to seal

Exhibit G.[18]

WE CONCUR:

---

[18] On appeal, the parties submitted a "Stipulated Motion to Seal Exhibit Previously Sealed in the Trial Court and Regarding Continued Protection of Confidential Information," Exhibit G to the "Declaration of Gary P. Seligman in Support of Defendant Federal Insurance Company's Motion for Summary Judgment." Because the trial court order does not comply with GR 15 and the record does not indicate that the court addressed Ishikawa, we deny the stipulated motion to seal the unredacted Exhibit G, and remand.