IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SEATTLE TUNNEL PARTNERS, a Washington joint venture,<br><br>Petitioner,<br><br>WASHINGTON STATE DEPARTMENT OF TRANSPORTATION,<br><br>Appellant-Petitioner,<br><br>HITACHI ZOSEN U.S.A. Ltd.,<br><br>Intervenor-Petitioner,<br><br>v.<br><br>GREAT LAKES REINSURANCE (UK) PLC, a foreign insurance company; ZURICH AMERICAN INSURANCE PLC, a New York insurance company; STARR SURPLUS LINES INSURANCE COMPANY; a Illinois insurance company; INDIAN HARBOR INSURANCE COMPANY, a Connecticut insurance company; ALLIANZ GLOBAL CORPORATE & SPECIALTY SE, a foreign insurance company; TORUS INSURANCE (UK) LIMITED, a foreign insurance company; PARTNER RE IRELAND INSURANCE LIMITED, a foreign insurance company; Does 1-100, individual and/or corporate members of SYNDICATE 382 at LLOYD'S, LONDON; and Does 101-200, individual and/or corporate members of SYNDICATE 1882 at LLOYD'S, LONDON,<br><br>Respondents. | No. 78691-1-I<br>(consolidated with No. 79060-9-I and No. 80260-7-I)<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

CHUN, J. — In 2011, Seattle Tunnel Partners (STP) contracted with the Washington State Department of Transportation (WSDOT) to construct a tunnel to replace the Alaskan Way Viaduct in Seattle. As part of the agreement, STP procured builder's risk insurance coverage (Policy). Section 1 of the Policy concerns the tunneling works and Section 2 concerns the tunnel boring machine (TBM) nicknamed "Bertha." The Policy names STP and WSDOT as insureds. Various insurers (Insurers) underwrote the Policy.

In 2013, the TBM ceased functioning and STP and WSDOT tendered claims under the Policy. The Insurers disputed coverage and STP and WSDOT sued, alleging wrongful denial of their claims. Hitachi Zosen U.S.A., which designed and manufactured the TBM, joined as an intervenor-plaintiff. The dispute raised questions relating to the interpretation of the Policy. The parties filed a series of cross motions for partial summary judgment, and the trial court granted the Insurers' motions and denied STP's, WSDOT's, and Hitachi's (Petitioners'[1]) motions.

STP and WSDOT petitioned for discretionary review. A commissioner of this court granted such review on whether the trial court erred in determining as a matter of law that (1) the Policy's Section 2 mechanical breakdown exclusion (MBE) excludes coverage for design defects, and (2) the claimed damages resulted from a single occurrence. The commissioner reserved for the panel whether to grant discretionary review on (1) whether STP and WSDOT can

---

[1] We use the term "Petitioners" when referring to all three of STP, WSDOT, and Hitachi.

recover under Section 1 of the Policy, (2) the meaning of the term "any item" in the Policy's Section 2 MBE, and (3) whether the Policy provides coverage for delay costs. The commissioner allowed the parties to brief these issues.

After the commissioner granted discretionary review, at the trial court level, the Insurers moved for summary judgment on WSDOT's remaining damages claims and its claim for declaratory judgment. The trial court granted summary judgment, entered partial final judgment, and WSDOT appealed the ruling. This court consolidated WSDOT's appeal with the grant of discretionary review. Hitachi moves to join the consolidated matter under RAP 5.3(i).

We grant Hitachi's motion to join this matter as a petitioner and grant review on the issues reserved by the commissioner. We reverse in part and affirm in part as follows: in the Petitioners' favor, we reverse the partial summary judgment rulings that a single occurrence caused the TBM damage and that "any item" in the Section 2 MBE means the entire TBM; and we reverse the summary judgment ruling that none of WSDOT's claimed damages relates to TBM repairs and dismissing WSDOT's claim for declaratory judgment. And in the Insurers' favor, we affirm the partial summary judgment rulings that STP and WSDOT cannot recover under Section 1 or for delay costs and that the Section 2 MBE bars recovery for damage caused by design defects.

## I. BACKGROUND

A. The Policy

In 2011, STP contracted with WSDOT to construct a tunnel to replace the Alaskan Way Viaduct. The contract required STP to procure builder's risk

3

insurance coverage for the tunneling works and the TBM, and STP acquired this coverage. The Policy names STP and WSDOT as insureds. STP obtained the TBM from Hitachi, which designed and manufactured it.

The Policy's Insuring Clause provides in pertinent part, "The Insurers will indemnify the Insured in respect of *direct physical loss, damage or destruction* (hereinafter referred to as 'Damage') not specifically excluded herein . . . happening to the Interest Insured." (Emphasis added.)

> The Interest Insured under Section 1 of the Policy is:
>
> The permanent and/or temporary works executed and in the course of execution materials supplies equipment and other goods (excluding Contractors Plant and Equipment) including Employers supplied items / free issue materials or any other property including temporary buildings and their contents for which the Insured is responsible or for which they hold themselves responsible or any of the Insured has agreed to insure or have instructions to insure which are used or intended for use in connection with the Project.

The Interest Insured under Section 2 of the Policy is the TBM.

The Policy covers damage to the TBM for a sublimit of up to $85 million for each "occurrence." The Policy defines "occurrence" as "one event or series of events consequent on or attributable to one source instance or cause, which results in Damage to or the destruction of Interest Insured."

Section 2 of the Policy includes the MBE, which excludes compensation for "Loss of or Damage in respect any item by its own explosion mechanical or electrical breakdown, failure breakage or derangement. This exclusion does not apply to resultant Damage to the property."

4

B. The Coverage Dispute

The TBM began mining in July 2013.  In October 2013, the rotating part of the center pipe of the TBM cracked.  In December 2013, the TBM ceased functioning.[2]  The TBM did not resume mining until December 2015.

WSDOT and STP tendered insurance claims based on the TBM damage, losses from the delay in mining, and construction of an access shaft built to repair the TBM.  The Insurers denied these claims.  STP sued the Insurers, claiming breach of contract, violation of unfair claims settlement practices regulations, Consumer Protection Act[3] violations, Insurance Fair Conduct Act[4] violations, and breach of the implied covenant of good faith.  They also sought declaratory relief.  WSDOT was joined as a necessary party by STP's First Amended Complaint.  WSDOT filed a complaint, requesting declaratory relief. Hitachi joined the action as an intervenor-plaintiff.

STP and the Insurers cross-moved for partial summary judgment.  Hitachi joined STP's motion and opposed the Insurers' motion.  WSDOT said that STP's motion should be granted in part and denied in part, and that the Insurers' motion should be denied in full.  The motions raised various issues relating to the interpretation of the Policy.  The trial court granted the Insurers' motion, concluding that the Section 2 MBE "excludes coverage for property damage to

---

[2] STP and WSDOT assert different causes for the TBM stoppage.  STP says it stopped because of an encounter with a well's casing, and WSDOT says it stopped because of operator error or design defects.

[3] Ch.19.86 RCW.

[4] RCW 48.30.101–.015.

the TBM caused by any alleged design defects." The court denied STP's motion, in which they argued to the contrary.

Petitioners STP and WSDOT then both moved for partial summary judgment, saying that the term "any item" as used in the Section 2 MBE refers to a component part of the TBM. The trial court denied these motions.

The Insurers then moved for partial summary judgment, which motion the trial court granted, concluding that: (1) the damages claimed stemmed from a single occurrence, and that "[n]o theory was presented to support a determination that more than one series of events caused separate damage [and] [f]actual disputes over the precise cause of the damage within the one chain of events are not material to this issue"; (2) "[t]he property insured under Section 1 did not sustain the requisite physical damage to trigger coverage under Section 1, and neither STP nor WSDOT incurred any costs to repair any alleged 'damage' to the permanent or temporary works sufficient to trigger coverage under Section 1"; and (3) "[t]he Policy does not afford Delay In Startup coverage or losses otherwise due to project delays."

STP and WSDOT petitioned for discretionary review of these rulings. A commissioner of this court granted such review on whether the Section 2 MBE excludes damages caused by design defects and whether the TBM damages stemmed from a single occurrence. The commissioner left for this panel to decide whether to grant review on (1) whether the tunnel sustained damage that would trigger Section 1 coverage; (2) the meaning of the term "any item" in Section 2; and (3) whether the Policy allows recovery for delay costs. After the

6

commissioner granted discretionary review, at the trial court level, the Insurers moved for summary judgment on WSDOT's declaratory judgment and damages claims. The trial court granted the motion, stating, "The delay elements claimed are delay costs, and costs arising from WSDOT's obligations to other [sic] were not necessary for the TBM repair." The trial court entered partial final judgment following this ruling, which WSDOT appealed. This court consolidated the appeal with the grant of discretionary review.

Hitachi filed a motion under RAP 5.3(i) to join this matter as a petitioner so that it could file briefing. The commissioner granted Hitachi's motion "to the extent that it [may] file briefs on the legal issues on which review [was] granted." The commissioner stated that "[t]he panel that considers the appeals on the merits will be in a better position to determine the extent to which it will consider Hitachi's arguments, as well as the extent to which Hitachi may be entitled to relief."[5]

## II. ANALYSIS

We review de novo a summary judgment ruling. Messenger v. Whitemarsh, 13 Wn. App. 2d 206, 210, 462 P.3d 861 (2020). "'Summary judgment is appropriate when there is no genuine issue as to any material fact

---

[5] Hitachi joins STP and WSDOT's claims that (1) the Section 2 MBE does not exclude coverage for damage caused by alleged design defects, (2) the TBM damage did not result from a single occurrence, and (3) the term "any item" does not mean the entire TBM. It takes no position on whether STP and WSDOT can recover under Section 1 or whether the Policy provides coverage for delay losses.

Hitachi does not join any portion of STP's or WSDOT's briefing that denies that the encounter with the well casing played a role in TBM damage or that suggests that any part of the TBM failed on its own.

and the moving party is entitled to a judgment as a matter of law.'" Id. (quoting

Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2014)). In

ruling on a summary judgment motion, "we consider all facts and make all

reasonable factual inferences in the light most favorable to the nonmoving party."

Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). "'A

genuine issue of material fact exists when reasonable minds could differ on the

facts controlling the outcome of the litigation.'" Id. (quoting Dowler v. Clover Park

Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011)).

"[I]nterpretation of an insurance policy is a question of law, and summary

judgment is appropriate if the contract has only one reasonable meaning when

viewed in the light of the parties' objective manifestations." Port of Seattle v.

Lexington Ins. Co., 111 Wn. App. 901, 907, 48 P.3d 334 (2002). A court must

construe insurance policies as a whole and give effect to each clause. Id. at

907–08.

A. Hitachi Joinder

Hitachi says we should grant its motion to join this matter as a petitioner.

The Insurers objected when Hitachi moved to join before the commissioner, but

apparently no longer object.

> RAP 5.3(i) allows joinder if:
>
> [t]here are multiple parties on a side of a case and fewer than all of the parties on that side of the case timely file a notice of appeal or notice for discretionary review, the appellate court will grant relief only (1) to a party who has timely filed a notice, (2) to a party who has been joined as provided in this section or (3) to a party if demanded by the necessities of the case. The appellate court will permit the joinder on review of a party who did not give notice only if

the party's rights or duties are derived through the rights or duties of a party who timely filed a notice or if the party's rights or duties are dependent upon the appellate court determination of the rights or duties of a party who timely filed notice.

The commissioner made the following ruling based on Hitachi's motion to join this matter:

> Subsection (1) is inapplicable; Hitachi did not file a notice seeking review. Although unclear, it appears that the strict requirements of subsection (3) are not met. But at this point it appears that Hitachi's rights may be dependent on this court's determination of the insurance policy exclusion issues raised in WSDOT's and STP's appeals. See subsection (2).

> I will grant Hitachi's motion to the extent that it will be permitted to file briefs on the legal issues on which review has been granted. The panel that considers the appeals on the merits will be in a better position to determine the extent to which it will consider Hitachi's arguments, as well as the extent to which Hitachi may be entitled to relief.

Presumably, our rulings on whether the Section 2 MBE excludes coverage for damages due to design defects will affect Hitachi's rights and duties as the designer and manufacturer of the TBM. It appears the Insurers no longer oppose Hitachi's joinder, and in their brief to the commissioner on this issue they acknowledged that "this Court's ruling on the Machinery Breakdown Exclusion may ultimately impact Hitachi's ability to recover insurance proceeds." We grant Hitachi's motion to join.

B. Section 2 - Machinery Breakdown Exclusion

The Section 2 MBE excludes coverage for "[l]oss of or [d]amage in respect *any item* by its own explosion mechanical or electrical breakdown, failure breakage or derangement. This exclusion does not apply to resultant Damage to the property." (Emphasis added.) The Petitioners say that the trial court erred in

concluding that the term "any item" in the MBE refers to the entire TBM, and in determining that the MBE excludes coverage for alleged design defects.[6] We conclude that the trial court erred in ruling that the term "any item" refers to the entire TBM, but properly ruled that the MBE excludes coverage for alleged design defects.

1. "Any item"

The trial court determined as a matter of law that the term "any item" in the Section 2 MBE means the TBM. The Petitioners say that "any item" unambiguously refers to a part of the TBM, instead of the entire TBM. We agree and conclude that the trial court erred in denying their partial summary judgment motion on this issue.[7]

The Policy does not define "any item." "Courts interpret insurance contracts as an average insurance purchaser would understand them and give undefined terms in these contracts their 'plain, ordinary, and popular' meaning." Kish v. Ins. Co. of N. Am., 125 Wn.2d 164, 170, 883 P.2d 308 (1994) (quoting Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 877, 881, 784 P.2d 507 (1990)). Washington courts will often turn to the dictionary definition of an undefined term to determine its meaning. See, e.g., id. at 171; Lui v. Essex Ins.

---

[6] This issue is consequential with respect to the MBE's "resultant [d]amage" clause. For example, if "any item" means a part of the TBM, then the MBE would not exclude damage to the TBM caused by a defective part.

[7] The commissioner left for us to decide whether to consider this issue. The parties have fully developed and briefed it, and the Insurers do not say we should not consider it. We consider this issue in the interest of judicial economy. See In re Dependency of A.S., 101 Wn. App. 60, 72, 6 P.3d 11 (2000) (noting that appellate courts have the authority, under RAP 12.2, to affirm, modify, or reverse a trial court order without further proceedings "when doing so would be a useless act or a waste of judicial resources").

Co., 185 Wn.2d 703, 713–14, 375 P.3d 596 (2016).  An insurance clause is ambiguous when, on its face, it is susceptible to two reasonable interpretations. Am. Nat. Fire. Ins. Co. v. B&L Trucking & Const. Co., Inc., 134 Wn.2d 413, 428, 951 P.2d 250 (1998).

An "item" is defined as "something that forms a contributory or component part or section of something specified."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1203 (2002).[8]  The term "any" precedes "item."  "Any" is defined as "one indifferently out of more than two."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (2002).[9]  And Washington courts construe the word "any" to mean "every" and "all."  NOVA Contracting, Inc. v. City of Olympia, 191 Wn.2d 854, 866, 426 P.3d 685 (2018).  These definitions of "any" and "item" imply numerosity and unambiguously indicate that the Section 2 MBE excludes coverage for breakdown of a single part of the TBM, not the entire TBM.

---

[8] As the Insurers note in their briefing, Webster's also defines "item" as "an object of attention, concern or interest."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1203 (2002).  They say that since the TBM is the object of attention or concern in the Policy, "item" means the TBM.

The Insurers omit the rest of the definition in their briefing: "an object of attention or concern or interest *to a specified degree or in a specified field or to a specified individual*."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1203 (2002) (emphasis added).  The usage examples make clear that the omitted portion helps in understanding this definition of "item."  Such examples include "an item *of great importance*," and "an essential item *for every home*."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1203 (2002) (emphasis added).  The usage examples cut against the Insurers' argument that "item" means "an object of attention" in a vacuum; instead, it is an object of attention in some degree or subject matter.  The Section 2 MBE does not use "item" like the usage examples provided for this definition, which shows that we should not interpret "item" merely as "an object of attention or concern."

[9] Webster's also defines "any" as "one, some, or all indiscriminately *of whatever quantity*."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (2002) (emphasis added).  The Insurers say that "any item" can mean "one item."  But this interpretation disregards the italicized portion of the definition; more accurately under this definition, "any item" is one of some quantity of items.

At oral argument, the Petitioners and Insurers agreed that the term "property," as used in the resultant damage clause of the MBE, refers to the TBM as a whole. Wash. Court of Appeals oral argument, <u>Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC</u>, No. 78691-1-I (Feb. 23, 2021), at 8 min., 0 sec.; 34 min., 40 sec., <u>video recording by</u> TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2021021324. It would make little sense for "property" to mean the TBM if "item" also means the TBM. And we must strictly construe exclusionary clauses against the Insurers. <u>Port of Seattle</u>, 111 Wn. App. at 908.

We conclude that the trial court erred in determining that "any item" means the entire TBM, rather than its component parts.[10]

2. Design defect exclusion

The trial court determined on partial summary judgment that the Section 2 MBE "excludes coverage for property damage to the TBM caused by any alleged design defects." The Petitioners say that the MBE does not unequivocally exclude coverage for design defects, so the trial court erred. We disagree.

---

[10] The Insurers point to Section 2's depreciation clause, in which the term "item" is used for the entire TBM. The TBM depreciation clause in Section 2 states, in pertinent part:

> (i)  Where damage to an insured [TBM] can be repaired the Insurers shall pay expenses necessarily incurred to restore *the damaged item* to its former state.
> . . .
> (ii)  Where a [TBM] is destroyed the Insurers shall pay the Actual Value of *the item* immediately before the occurrence of the loss . . .

(Emphasis added.) The Petitioners rightly counter that in the depreciation clause, "[TBM]" is an antecedent to "the item," and no such antecedent exists in the Section 2 MBE. This other usage of "item" in the Policy does not alter the conclusion that, in the MBE, an "item" is a part of the TBM.

As noted by the Petitioners, the Section 2 MBE does not expressly exclude coverage for design defects. And "in an all-risk policy, 'any peril *that is not specifically excluded* in the policy is an insured peril.'" Vision One, LLC v. Philadelphia Indem. Ins. Co., 174 Wn.2d 501, 513, 276 P.3d 300 (2012) (quoting Findlay v. United Pac. Ins. Co., 129 Wn.2d 368, 378, 917 P.2d 116 (1996)). The Petitioners say that because Section 1 includes a design defect exclusion and Section 2 does not, the trial court should have interpreted Section 2 not to exclude coverage for design defects.[11] Indeed, no design defect exclusion expressly appears in Section 2. But a Section 2 design defect exclusion would be superfluous with the MBE, since, as we address below, the MBE as written excludes coverage for damage from design defects. The absence of an explicit design defect exclusion in the Section 2 MBE does not necessitate the conclusion that it covers damage arising from design defects.

---

[11] The Section 1 design defect exclusion states:

The Insurers shall not indemnify the Insured for:

1. Defects of material workmanship design plan or specification (LEG2/96)

All costs rendered necessary by defects of material workmanship design plan or specification and should Damage occur to any portion of the Interest Insured containing any of the said defects the cost of replacement or rectification which is hereby excluded is that cost which would have been incurred if replacement or rectification of the Interest Insured had been put in hand immediately prior to the said Damage.

For the purpose of this Policy and not merely this exclusion it is understood and agreed that any portion of the Interest Insured shall not be regarded as damaged solely by virtue of the existence of any defect of material workmanship design plan or specification.

Out-of-state decisions help guide our analysis of whether the Section 2 MBE excludes coverage for design defects. Based on these cases, we conclude that it does.

  a. Section 2 MBE prevents recovery for internal causes of damage

Various courts have interpreted mechanical breakdown exclusions as preventing recovery for harm caused by internal causes, rather than external causes. The parties agree that this MBE prevents recovery for internal causes, and applicable law appears consistent with their position. See, e.g., Connie's Constr. Co. v. Cont'l W. Ins. Co., 227 N.W.2d 204, 207 (Iowa 1975) (holding that a mechanical breakdown is a functional defect in machinery, and that an MBE did not exclude coverage because the breakdown of a crane was an effect of user error, not the cause of the plaintiff's loss); Caldwell v. Transp. Ins. Co., 234 Va. 639, 644, 364 S.E.2d 1 (1988) (holding that an MBE "is restricted to losses arising from internal or inherent deficiency or defect, rather than from any external cause."); see also James W. Fowler Co. v. QBE Ins. Corp., 474 F. Supp. 3d 1149, 1160–61 (D. Or. 2020) (adopting Caldwell's reasoning).

In addition, the MBE excludes "Loss of or Damage in respect any item *by its own* explosion mechanical or electrical breakdown, failure breakage or derangement." (Emphasis added.) The inclusion of "by its own" likewise indicates that the MBE excludes coverage for internal causes of damage.

Relying on the joint concession of the parties, the above decisional interpretations of similar MBEs, and the text of the MBE, we conclude that the Section 2 MBE excludes coverage for internal causes of damage.

b. A design defect is an internal cause of damage

We also adopt the reasoning that, as the Insurers say, a design defect is an internal cause, since design defects are inherent to the insured subject matter.

In GTE Corp. v. Allendale Mutual Insurance Co., GTE sued its all-risk insurers seeking to recover the costs it incurred in remediating its computer system to avoid "Y2K" date-recognition problems. 372 F.3d 598, 601 (3d Cir. 2004). The Third Circuit analyzed a design defect exclusion in the policy to decide whether, as the claimants argued, a design defect is "external." Id. at 611–12. The Third Circuit rejected GTE's argument and held that the design defect causing the Y2K threat was "internal," reasoning:

> We disagree with the suggestion that the Y2K threat is "external" merely because GTE's systems interacted with other systems or read data from outside sources. Such a conception of external would essentially allow all defective designs and inherent vices to be characterized as external problems. For example, if a car is defectively designed so that the tires come off when the car is driven at 10 miles per hour, the threat is not external merely because the "external" event of the road contacting the tire caused the tires to fly off. The road contacting the tire is an entirely predictable event that is inherent to the very function and purpose of the automobile—there is no problem independent of the automotive design. To take another example, if a dam whose very purpose is to hold water falls apart when the water rises to an entirely predictable level, the rising of the water is not an "external" problem—the problem is that the dam was not properly designed to allow it to perform precisely the function it was intended to perform, the holding of water.

Id. at 612.

And in Acme Galvanizing Co. v. Fireman's Fund Insurance Co., the court held that "where defective construction, design, or fabrication of property results

15

in the property's failure or deterioration before its normal life, and the defect is not apparent upon reasonable inspection but only after a post-failure examination by an expert, then the resulting loss is caused by a 'latent defect.'" 221 Cal. App. 3d 170, 178, 270 Cal. Rptr. 405, 410 (1990).[12]

These decisions offer a convincing rationale as to why we should view a design defect as an internal cause of damage; a product's design is something inherent to it and inseparable from it.[13] Even given that we must strictly construe

---

[12] "Latent defect," "inherent defect," and internal cause have been used interchangeably. See, e.g., 11 STEVEN PLITT ET AL., COUCH ON INSURANCE § 153:77 (3d ed. & Supp. 2020); Connie's Constr., 227 N.W.2d at 207 ("'Latent defect' also presupposes that the loss was caused by an internal defect in the machine."); Caldwell, 234 Va. at 644 ("we hold that the effect of its exclusion of losses caused by structural or mechanical breakdown or failure is restricted to losses arising from internal or inherent deficiency or defect, rather than from any external cause.").

[13] The Petitioners cite two decisions concluding that a design defect is an external cause of damage. Neither persuades us that the Section 2 MBE does not exclude recovery for design defects here.

In N-Ren Corp. v. American Home Assurance Co., the Eighth Circuit followed a different line of reasoning, concluding that "the requirement of an 'external cause' is intended to exclude from coverage three types of losses: (1) losses resulting from negligent acts of the owner or master, (2) losses resulting from normal wear and tear, and (3) losses resulting from internal decomposition or deterioration of the insured property." 619 F.2d 784, 787–88 (8th Cir. 1980) (citing Contractors Realty Co. v. Ins. Co. of N. Am., 469 F. Supp. 1287 (S.D.N.Y. 1979)). Reasoning that a design defect did not fall into any of those three categories, it concluded that design defects are external. Id. at 788. But this categorization—which appears to be an outlier—is unpersuasive given the conception of a product's design as inherent to it. And unlike the MBE here, the provision at issue in N-Ren did not include the phrase "by its own." Id. at 785.

In Standard Structural Steel v. Bethlehem Steel Corp., the court said that a design defect is not an inherent vice, but there, the stated "design defect" was the insureds' failure to follow engineering specifications for an object they constructed. 597 F. Supp. 164, 195 (D. Conn. 1984). As applied to these facts, the term "design defect," as used in Standard Structural Steel, would more resemble a failure by STP or WSDOT to assemble the TBM as specified by Hitachi; but here, Hitachi designed and manufactured the TBM. Also, in Standard Structural Steel, the court stated that "[a] cause is external if damage which arises from it does not result wholly 'from an inherent defect in the subject matter or from the inherent deficient qualities, nature and properties of the subject matter.'" Id. at 193 (quoting Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am., 566 F. Supp. 258, 261 (W.D. Pa.1983)). This statement tracks our

16

exclusionary clauses against the Insurers, the MBE excludes coverage for design defects.[14]

### C. Single Occurrence

The Petitioners say that the trial court erred in determining as a matter of law that the damages to the TBM stem from a single occurrence covered by Section 2, which would cap their recovery at $85 million. The Insurers respond that the trial court did not err because the damage to the TBM occurred as the result of a single series of events. We agree with the Petitioners.

The Policy covers damage to the TBM for a sublimit of up to $85 million for each "occurrence." The Policy defines an "occurrence" as "one event or series of events consequent on or attributable to one source instance or cause, which results in Damage to or the destruction of Interest insured."

In moving for summary judgment, the Insurers claimed that coverage under Section 2 of the Policy is limited to the $85 million sublimit since there was only one "occurrence" triggering the policy. In its opposition to the motion, WSDOT said that there are genuine issues of material fact as to whether the

---

conclusion that a design defect as claimed by the Petitioners is something inherent to the TBM, and would thus be excluded as an internal cause of harm.

[14] The Petitioners, assuming that the Policy covers damage for design defects and that design defects caused the ensuing damage to the TBM, say that the MBE should not exclude coverage for damage to the TBM because the efficient proximate cause of the harm was a covered design defect. The efficient proximate cause doctrine provides coverage if a "'covered peril sets in motion a causal chain, the last link of which is an uncovered peril.'" Xia v. ProBuilders Specialty Ins. Co., 188 Wn.2d 171, 182–83, 400 P.3d 1234 (2017) (quoting Key Tronic Corp., Inc. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wn.2d 618, 625, 881 P.2d 201 (1994)) (internal brackets omitted). But since we conclude that the Section 2 MBE excludes coverage for design defects, and thus "design defects" are not covered perils, the efficient proximate cause doctrine does not lead to coverage for the Petitioners.

TBM was damaged by more than one occurrence. WSDOT asserted that "it remains to be decided what were the 'source[s] instance[s] or cause[s]' of the TBM's damage," and that "[t]he damage may have resulted from design defects, operator errors, or, as STP alleges, [encounter with the well casing]." (Most alterations in original.) STP and Hitachi made similar assertions.

The trial court ruled that a single occurrence caused the claimed damages: "No theory was presented to support a determination that more than one series of events caused separate damage. Factual disputes over the precise cause of the damage within the one chain of events are not material to this issue."

The Petitioners say the trial court erred because collectively, they presented evidence of three potential separate and independent causes of the TBM's stoppage and damage: design defect, operator error, and encounter with the well casing. The Insurers say that because the dictionary defines "instance" as "a situation viewed as part of a process or *series of events*," there was only one occurrence. (Emphasis added.) We agree with the Petitioners.

Under Washington law, the number of occurrences "depends on the number of causes underlying the alleged damage and resulting liability." Transcon. Ins. Co. v. Wash. Pub. Utils. Dists.' Util. Sys., 111 Wn.2d 452, 467, 760 P.2d 337 (1988). Washington follows the majority rule, which establishes that "the number of occurrences should be determined by identifying the cause of the injury rather than the effect, that is, the injuries themselves." 35 DAVID K. DEWOLF & MATTHEW C. ALBRECHT, WASHINGTON PRACTICE: WASHINGTON

INSURANCE LAW AND LITIGATION § 22.8 (2020–21 ed.). By contrast, "the minority view adopts the effects test and determines the number of occurrences by looking at the injury from the point of view of the person whose property is damaged." Id.

In Transcontinental, bondholders raised insurance claims arising out of a bond default. 111 Wn.2d at 454. The insured said its liability was limited because all damages flowed from one occurrence. Id. at 466. Reviewing a decision by the trial court on summary judgment, our Supreme Court disagreed, recognizing that the bondholders' allegations involved several injuries flowing from multiple events: "[a]lthough [the cause identified by insurers] may have been a cause for some damages alleged, other alleged causes potentially exist." Id. The court effectively held that the insured presented evidence suggesting that each of the alleged causes of damage could constitute an "occurrence." Id. at 454, 466–67.

As in Transcontinental, the Petitioners submitted evidence of multiple independent potential sources of damage to the TBM: they submitted internal Hitachi e-mails, deposition testimony, and an expert report suggesting that a design defect caused the damage; interrogatory answers, internal Hitachi e-mails, an insurance claim, an expert report, and deposition testimony suggesting that operator error caused the damage; and an e-mail from a WSDOT consultant, notes from an Insurer meeting, and an internal Hitachi e-mail suggesting that the encounter with the well casing caused the damage. Under Transcontinental, each could constitute a separate occurrence.

Although the Insurers say the alleged causes of harm were a "series of events," they do not rebut the assertion that each of the claimed causes was enough to cause TBM damage. And if there are multiple sufficient causes of the damage, then there are multiple "occurrences." Even though the MBE bars recovery for damage caused by design defects, the evidence, when viewed in the light most favorable to the Petitioners, shows a genuine issue of material fact that either operator error or encounter with the well casing could have caused the damage, constituting two "occurrences." We conclude that the Petitioners raised a genuine issue of material fact that more than one cause could have led to the TBM damage, and that trial court erred by ruling on partial summary judgment that only one series of events caused damage to the TBM.

The Petitioners also say that another occurrence of harm was the deformation and cracking of the TBM's center pipe in October 2013. The Insurers respond that since the Petitioners did not raise this claim below, they cannot now. The Petitioners counter, without citing applicable law, that the law did not require them to allege when the TBM suffered damage. The Petitioners do not show where they made a claim for damage occurring to the TBM in October 2013. No such claim appeared in WSDOT's, STP's, or Hitachi's opposition to the Insurers' motion for partial summary judgment. And "[o]n review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court." RAP 9.12. Thus, the trial court did not err by failing to recognize the deformation of the TBM's center pipe as another "occurrence."

20

D. Section 1 Coverage

STP and WSDOT say that the trial court erred in ruling that Section 1 does not provide coverage for (1) loss of use of the tunnel while the TBM was not mining due to repairs, or (2) damage to the tunnel envelope resulting from construction of the access shaft. Since whether the trial court properly dismissed WSDOT's declaratory judgment claim—which WSDOT appealed as of right—depends in part on resolution of this issue,[15] we address it. We disagree with STP and WSDOT's assertions.

The Insuring Clause states, in pertinent part: "[t]he Insurers will indemnify the Insured in respect of *direct physical loss, damage or destruction* (hereinafter referred to as "Damage") not specifically excluded herein . . . happening to the Interest Insured." (Emphasis added.) The Interest Insured under Section 1 is "[t]he permanent and/or temporary works executed and in the course of execution materials supplies equipment and other goods (excluding Contractors Plant and Equipment)." The parties agree that the interest insured under Section 1 includes the tunnel. And the "temporary works," as defined by the Policy, are "all structures and their materials which are not intended to form part of the permanent works but which are intended to provide working access to the Site or to the permanent works or which are intended to provide temporary support to the permanent works under construction."

_____

[15] If Section 1 provides coverage for loss of use or damage resulting from construction of the access shaft, then the trial court improperly reasoned that WSDOT cannot sustain a declaratory judgment action because it can recover only under Section 2.

21

The trial court ruled that "[t]he property insured under Section 1 did not sustain the requisite physical damage to trigger coverage under Section 1, and neither STP nor WSDOT incurred any costs to repair any alleged 'damage' to the permanent or temporary works sufficient to trigger coverage under Section 1."

1. Loss of use

The plain language of the Policy does not provide coverage for loss of use of the tunnel.  And if a policy's "language is clear and unambiguous, we must enforce it as written and not modify the insurance contract or create ambiguity where none exists."  Quellos Grp. LLC v. Fed. Ins. Co., 177 Wn. App. 620, 634, 312 P.3d 734 (2013).

STP and WSDOT cite out-of-state decisions to support their claim that loss of use of the tunnel is a type of "physical loss, damage or destruction" and is covered by Section 1.  But Washington case law shows that if a policy provides coverage for "physical" loss, it does not provide coverage for loss of use unless that loss of use arises out of or as a result of the physical loss.

In Prudential Property and Casualty Insurance Co. v. Lawrence, an insurer contended it had no duty to indemnify or to defend its insureds from a neighbor's claim that their newly constructed home obstructed their view.  45 Wn. App. 111, 112, 724 P.2d 418 (1986).  The insureds contended the neighbor's alleged damages came within the definition of "property damage" under their homeowner's policy and their personal catastrophe policy.  Id. at 114.  This court distinguished the homeowner's policy, which provided coverage for "physical injury to or destruction of tangible property, including loss of use of this property,"

22

from the catastrophe policy, which provided coverage for "damage to or destruction of tangible property. Property damage also includes the loss of the use of the damaged or destroyed property." Id. at 115, 117 (emphasis and internal quotation marks omitted). The homeowner's policy explicitly required physical damage, whereas the catastrophe policy did not. Id. at 115. The court concluded the insurer had a duty to defend and indemnify its insureds from the view obstruction claim under the catastrophe policy because language similar to it "has been broadly construed to encompass damage diminution in the value of property, even when no physical damage has otherwise occurred." Id. at 117. The court declined to determine whether the alleged diminution in value constituted "property damage" under the homeowner policy, but strongly suggested it would not unless it resulted from physical injury to the house itself. Id. at 116-17.

Similarly, in Guelich v. American Protection Insurance Co., insureds sued an insurer alleging that under their umbrella policy, the insurer had a duty to defend and indemnify them from a neighbor's claim that the construction of their home denied the neighbor reasonable use of his view. 54 Wn. App. 117, 118, 772 P.2d 536 (1989). The policy covered property damage, defined as "physical injury to tangible property. It include[d] loss of use of injured property." Id. at 120 (emphasis and internal quotation marks omitted). Citing Prudential, the court held that the loss of use of a view did not constitute property damage as defined in the policy because the loss of use was not the result of physical injury to any tangible property. Id. at 120–21; see also Walla Walla Coll. v. Ohio Cas. Ins.

<u>Co.</u>, 149 Wn. App. 726, 735, 204 P.3d 961 (2009) (diminution of value of ruptured underground storage tank not "property damage" under commercial policy).

These decisions support the conclusion that since the Policy provision in question covers only direct physical loss—and does not even cover loss of use occasioned by direct physical loss—STP and WSDOT cannot recover under Section 1 for loss of use of the tunnel while repairing the TBM.[16]

2. Claimed damage to the tunnel envelope

To repair the TBM, STP had to excavate an access shaft. Construction of this shaft required alteration of the "tunnel envelope"—i.e., the property owned by WSDOT surrounding the path of the planned tunnel. WSDOT claimed that the access shaft, a large concrete structure, inhibited the future usefulness of the earth surrounding the tunnel and obstructed potential future utility locations. STP

---

[16] As to out-of-state decisions cited by STP and WSDOT, some might allow recovery for loss of use based on a "direct physical injury" provision. <u>See, e.g.</u>, <u>TRAVCO Ins. Co. v. Ward</u>, 715 F. Supp. 2d 699, 708–09 (E.D. Va. 2010) (construing "direct physical loss" provision along with loss of use provision to allow recovery for replacement of undamaged but defective drywall that released sulfuric gas into the claimant's home, where the property was rendered unusable by the gas emission); <u>Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.</u>, 406 N.J. Super. 524, 543–44, 968 A.2d 724 (Ct. App. Div. 2009) (allowing recovery under a "physical damage" provision for loss of use of a supermarket chain's refrigerators following a blackout). But others, as noted by the Insurers, allow recovery when the loss of use occurred because of a physical effect on the insured property. For instance, in <u>Western Fire Insurance Co. v. First Presbyterian Church</u>, the Colorado Supreme Court considered whether a policy providing direct physical loss coverage to an insured church would also provide loss of use coverage for the church after gasoline accumulated around and under the church, rendering use of the building highly dangerous. 165 Colo. 34, 38–39, 437 P.2d 52 (1968). The court concluded that although the loss of use did not constitute a direct physical loss, the accumulation of gasoline did and thus extended coverage. <u>Id.</u>; <u>see also</u> <u>Motorists Mut. Ins. Co. v. Hardinger</u>, 131 F. App'x. 823, 825–27 (3d Cir. 2005) (allowing recovery, under a policy requiring "direct physical loss or risk of a direct physical loss," for loss of use of a home where its well became infected with e-coli bacteria).

claimed it incurred approximately $40 million in costs to construct this shaft and to lift the TBM's cutterhead to the surface. It also claimed about $1 million related to relocation and restoration of utilities associated with access shaft construction. WSDOT claimed it incurred around $1 million—mostly labor costs—related to the construction of the access shaft. In its briefing, WSDOT also says that it incurred costs related to refilling the access shaft, but the associated citations to the record show no such costs.

STP and WSDOT say that Section 1 covers the tunnel envelope.[17] They also say that because they had to alter the tunnel envelope and its alignment, direct physical loss occurred, triggering Section 1. While we agree that Section 1 would cover direct physical damage to the tunnel envelope, we conclude that STP and WSDOT have not shown a genuine issue of material fact that any damage triggering Section 1 occurred.

In a CR 30(b)(6) deposition of a WSDOT employee, the employee testified that he believed WSDOT had not incurred any costs because of the adjustment to the tunnel alignment. Regarding future usefulness of the tunnel, the employee testified that the TBM stoppage inhibited WSDOT's ability to "create utility in the alignment . . . for a period of two years while the TBM was stopped." Thus, its

---

[17] The Insurers acknowledged below that the Interest Insured under Section 1 includes the property used or intended for use in the construction of the tunnel. The Insurers now say Section 1 does not insure the tunnel envelope. But WSDOT owned the land surrounding the tunnel and it used the land in its construction. And the Section 1 Interest Insured includes "any other property . . . which are used or intended for use in connection with the Project." Thus, Section 1 insures the tunnel envelope. Also, "[o]n review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court." RAP 9.12.

"future usefulness" claim constitutes an excluded delay cost. And STP and WSDOT do not show whether the "damages" to the interest insured by Section 1 that they say arose from construction of the access shaft exceed or differ from the costs of constructing the access shaft, which as we address below, are recoverable under Section 2. The record as a whole shows no costs arising from any claimed damage to the interest insured by Section 1.

Thus, we conclude that the trial court properly ruled that construction of the access shaft and the resulting change to the tunnel envelope did not trigger Section 1.[18]

E. Delay in Startup Coverage

The trial court ruled that "[t]he Policy does not afford Delay In Startup coverage or losses otherwise due to project delays." STP and WSDOT say that

---

[18] While the parties do not brief this issue, we note that STP and WSDOT apparently seek to recover costs that stem from decisions they made to access the damaged TBM, and were not the result of any external event.

In Wolstein v. Yorkshire Insurance Co., this court adopted reasoning from the Fifth Circuit that a physical loss or damage requirement "'strongly implies that there was an initial satisfactory state that was changed by some *external event* into an unsatisfactory state.'" 97 Wn. App. 201, 213, 985 P.2d 400 (1999) (emphasis added) (quoting Trinity Indus., Inc. v. Ins. Co. of N. Am., 916 F.2d 267, 270–71 (5th Cir. 1990)). And in AFLAC Inc. v. Chubb & Sons, Inc., the court concluded a claimant could not recover remediation costs related to the Y2K problem from its all-risk insurers because no fortuitous event occurred, reasoning first that "[t]he word 'direct' as modifying the word 'physical' means only that the change in the insured property occurred by the action of the *fortuitous event* triggering coverage." 260 Ga. App. 306, 308–09 n.5, 581 S.E.2d 317, 319 (2003) (citing Black's Law Dictionary (6th ed.), p. 654) ("An event happening by chance or accident. That which happens by a cause which cannot be resisted. An unforeseen occurrence, not caused by either of the parties, nor such as they could prevent."). It also reasoned that "'[D]irect physical loss or damage' . . . indicate[s] that [a policy] contemplates an actual change in insured property . . . occasioned by accident or other fortuitous event." AFLAC, 260 Ga. App. at 309.

It appears that the method of repair chosen by STP and WSDOT does not constitute an external event causing damage, and thus direct physical loss, to the tunnel envelope.

the trial court erred in so ruling because the Basis of Indemnity Clause in the

Policy allows coverage for costs related to delay.  Since the propriety of

dismissing WSDOT's declaratory judgment motion depends in part on whether

the Policy allows it to recover delay costs,[19] we reach this issue on discretionary

review but reject STP and WSDOT's claim.

> The Basis of Indemnity Clause states:
>
> In the event of Damage to the Interest Insured, the amount payable by the Insurer shall be the full cost of reinstatement of such Interest Insured.
>
> For the purposes of calculating the full cost of reinstatement, the following provisions shall apply:
>
> A. Where Damage to Interest Insured can be repaired the cost of reinstatement shall refer to the restoration of the damaged portion of the Interest Insured to a condition substantially the same as but not better or more extensive than its condition when new.
>
> B. Where the Interest Insured is:
>
>   i) totally lost or destroyed or
>
>   ii) damaged and the cost of repairs equal, or exceed the value of the damaged Interest Insured (whereby the Interest Insured shall be deemed to be totally lost or destroyed)
>
> the cost of reinstatement shall refer to the replacement thereof by similar property in a condition equal to but not better or more extensive than its condition when new less the value of any salvage.
>
> C. In all cases, the cost of reinstatement shall refer to the final cost to the Insured after completion of the repair, reinstatement or replacement work (including a reasonable margin for profit where such work is carried out in whole or in part by the Insured).

STP and WSDOT say that costs associated with delay constitute a "cost

of reinstatement" under Paragraph C.  The Insurers do not dispute, and appear

---

[19] If the Policy allows for delay coverage, then the trial court improperly reasoned that WSDOT cannot sustain a declaratory judgment action because it can recover only for physical damage.

to endorse, STP and WSDOT's characterization of the Policy as an "all-risk" policy. And "in an all-risk policy, 'any peril *that is not specifically excluded* in the policy is an insured peril.'" Vision One, 174 Wn.2d at 513 (quoting Findlay, 129 Wn.2d at 378). Thus, STP and WSDOT say, since the Policy does not exclude coverage for delay costs, it provides such coverage. We disagree.

In Vision One, our Supreme Court examined similar policy provisions and decided that they did not cover delay costs. Id. at 522–23. There, while pouring concrete for the first floor of a condominium project in Tacoma, shoring underneath the concrete collapsed, causing the framing, rebar, and newly poured concrete to crash down to the lower level parking area, where the wet concrete hardened. Id. at 506. It took several weeks to clean up the debris, repair the damage, and reconstruct the collapsed floor. Id. Vision One submitted a claim to its insurer under its all-risk insurance policy. Id. It sought millions of dollars of delay losses under the policy and claimed the trial court erred in limiting its recovery to $1 million under an extra-expense endorsement. Id. at 522. This endorsement allowed "$1 million in coverage for certain losses incurred as the result of the project being delayed, when the delay is directly caused" by certain enumerated causes of loss. Id. (internal quotation marks and brackets omitted). The delay losses explicitly covered included construction loan interest, real estate and property taxes, and legal and accounting fees. Id. The trial court ruled that the general policy, which had a $12.5 million limit, covered only "*direct physical loss* to Covered Property caused by a covered peril," and did not cover these "soft costs." Id. (emphasis added). There, as here, the insured claimed

28

that the general policy covered the soft costs since it did not exclude them.  Id. at 523.  Our Supreme Court disagreed with the insured, holding that while the general policy was all-risk, it extended coverage for only *physical* losses to covered property: "Because the policy did not cover soft costs, there was no need to exclude them."  Id.  It affirmed the trial court's ruling that Vision One was limited to recovering $1 million in delay costs under the extra-expense endorsement.  Id.

Here, like in Vision One, the Insuring Clause provides coverage only for "direct physical loss, damage or destruction."  The Policy does not provide coverage for non-physical losses such as delay costs.  Given the Policy's limit of coverage to direct physical loss, STP and WSDOT's claim that the Basis of Indemnity clause somehow broadens the coverage to non-physical loss is unavailing.

F.  WSDOT's Claimed Costs

WSDOT's complaint includes claims for 24 categories of costs linked to stoppage of the TBM.  After the trial court ruled that STP and WSDOT could not recover under Section 1 or for delay costs, the Insurers moved for summary judgment on these 24 claims, saying that none of the claimed costs were recoverable under Section 2 since they did not constitute TBM repair costs or were delay costs.  The trial court granted summary judgment, concluding, "The delay elements claimed are delay costs, and costs arising from WSDOT's obligations to other [sic] were not necessary for the TBM repair."

WSDOT says that there are genuine issues of material fact as to whether its claimed costs are related to the TBM repair. Specifically, WSDOT says that the trial court erred in ruling that it could not recover under the Policy for claimed elements 1, 7, 10a, 10b, 13, 15, 16, and 16a.[20]

We conclude that genuine issues of material fact exist as to whether elements 1, 7, 10a, 13, 16 and 16a related to TBM repair costs. Thus, we reverse the trial court's grant of summary judgment as to these elements. But WSDOT does not raise a genuine issue of material fact as to elements 10b and 15, and we therefore affirm summary judgment as to them.

Section 2 allows recovery in the event of damage to the TBM for: (1) "costs and expenses necessarily incurred by the Insured in the removal of and disposal of the debris of [the TBM], detritus or materials brought on to the Site as a consequence of Damage"; (2) "architects', surveyors', consulting engineers' and other professional fees reasonably and necessarily incurred by or on behalf of any of the Insured incurred in the repair, reinstatement or replacement"; and (3) where damage to the TBM can be repaired, "expenses necessarily incurred to restore the [TBM] to its former state of serviceability."

Courts liberally construe insurance policies to provide coverage whenever possible. Feenix Parkside LLC v. Berkley N. Pac., 8 Wn. App. 2d 381, 394, 438

---

[20] WSDOT also claims in its supplemental brief that elements 1a, 2, 3, 4, 6, 8, 17, 18, 19, 21, 22, 23, 24, and 25 "include[] many other costs that were necessarily spent in connection with the TBM's repair" or "were made necessary by the TBM repairs and access shaft," but does not support that claim with analysis and does not renew any argument related to these elements in its reply briefing. We need not address claims unsupported by argument. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

P.3d 597 (2019). As to a motion for summary judgment, courts must construe all facts and inferences in favor of the nonmoving party. Messenger, 13 Wn. App. 2d at 210. We review the evidence presented by WSDOT about each claimed element in the light most favorable to it to determine whether there is a genuine issue of material fact that the element relates to TBM repair.

1. Element 1

Element 1 relates mainly to WSDOT labor costs centered on tunnel repairs, including engineering and design consultants for construction of the access shaft. The Insurers say that these costs cannot constitute repair costs because they were not for those who performed repair work, but for those who supervised it. But the Policy allows recovery for "consulting engineers' and other professional fees reasonably and necessarily incurred by or on behalf of any of the insured [parties] incurred in the repair, reinstatement or replacement" of the TBM. And according to WSDOT and STP's joint expert report and a declaration by the WSDOT SR 99 Tunnel Director, at least some of these "supervisory" labor costs were for the services of consulting engineers. The Basis of Indemnity clause does not limit recovery costs for repairs only to physical repair work, and a court must liberally construe a policy in favor of the insured party. Feenix Parkside, 8 Wn. App. 2d at 394. The Insurers' argument appears to have no basis in law. There is a genuine issue of material fact on this element.

2. Element 7

Element 7 relates to costs associated with a city of Seattle project services agreement, in which Seattle provided various support functions for WSDOT to

assist the TBM project. Some costs claimed under this element related only to delay of the project. But some costs claimed under this element included design review and construction inspection for the access shaft used to repair the TBM. There is a genuine issue of fact on this element.

3. Element 10a

Element 10a relates to costs associated with extending leases with the Port of Seattle. According to the SR 99 Tunnel Director, STP used at least one of the warehouses leased from the Port of Seattle for storage of parts and tools for the TBM repair, and used another to stage equipment for the repairs. There is a genuine issue of fact on this element.

4. Element 10b

Element 10b relates to costs associated with extending Temporary Construction Easements. The costs claimed under this element related not to repairs but to delay costs.[21] Even when viewing the evidence in the light most favorable to WSDOT, there is no genuine issue of fact on this element.

5. Element 13

Element 13 relates to costs associated with WSDOT's supervision of the excavation of the access shaft. WSDOT's Cost Tabulation report and WSDOT and STP's joint expert report account for these costs. Since the purpose of the access shaft was repair of the TBM, there is a genuine issue of fact on this

---

[21] "Element 10b (Temporary Construction Easements) includes the *cost to extend* construction easements for the erection and maintenance of structural supports on surrounding buildings during the construction of the access shaft." (Emphasis added.)

element. And as addressed above in element 1, the Insurers' claim that these costs cannot relate to repairs because they are supervisory costs is unavailing.

### 6. Element 15

Element 15 relates to costs associated with the replacement of a nearby condominium building's windows to mitigate noise from construction of the access shaft. WSDOT's Cost Tabulation report and WSDOT and STP's joint expert report account for these costs. But WSDOT submits no evidence showing that these costs were necessary to repair the TBM. Even when viewing the evidence in the light most favorable to WSDOT, there is no genuine issue of fact on this element.

### 7. Element 16

Element 16 relates to costs associated with moving electrical utilities the location of which conflicted with the location of the access shaft. WSDOT and STP's joint expert report accounts for these costs and a WSDOT employee testified that they were necessary for construction of the access shaft. If this is correct, they were necessary for repair of the TBM. There is a genuine issue of material fact on this element.

### 8. Element 16a

Element 16a relates to STP Change Orders. WSDOT's Cost Tabulation report and WSDOT and STP's joint expert report account for these costs. A WSDOT consultant testified in a deposition that costs associated with these change orders arose because of the construction of the access shaft that was used to repair the TBM. There is a genuine issue of fact on this element.

In sum, we conclude that WSDOT raised genuine issues of material fact as to whether elements 1, 7, 10a, 13, 16 and 16a related to repair of the TBM. Thus, we reverse the trial court's summary judgment dismissal of WSDOT's claim for these costs. And since we do so, we also reverse the trial court's dismissal on summary judgment of WSDOT's declaratory judgment claim.

### III. CONCLUSION

We grant Hitachi's motion to join this matter and grant review on the reserved issues. We reverse in part and affirm in part: we reverse the partial summary judgment rulings that a single occurrence caused the TBM damage and that "any item" in the Section 2 MBE means the entire TBM; we reverse the summary judgment ruling that none of WSDOT's claimed damages relates to TBM repairs and the dismissal of WSDOT's claim for declaratory judgment; and we affirm the partial summary judgment rulings that STP and WSDOT cannot recover under Section 1 or for delay costs and that the Section 2 MBE bars recovery for damage caused by design defects.

_Chun, J._

WE CONCUR:

_Andrus, A.C.J._   _Mann, C.J._